## Commonwealth v. Cohen

*George D'Ambrosio,* for Commonwealth.
*Louis Lipschitz,* for defendant.

ROSENWALD, J., March 7, 1974.—Defendant, Edward Cohen, was indicted and charged on a total of 108 bills of indictment, August sessions, 1971, nos. 653 to 760, inclusive, with fraudulent conversion, embezzlement by a public officer, conspiracy, malfeasance, misfeasance and nonfeasance. These bills of indictment resulted from an alleged investigation of the traffic court by the district attorney's office.[1] The investigation commenced some time in 1970 and it focused on defendant in February of 1971.[2]

The assistant district attorney in charge of the investigation was George D'Ambrosio, Esq. In addition to being involved in the investigation, Assistant District Attorney D'Ambrosio was in charge of the prosecution of this defendant.

Defendant had been charged with having committed the aforementioned offenses while performing the duties *as a writ server for the Traffic Court of Philadelphia.* During this same period of time, defendant also was performing the functions of a writ server for the Landlord and Tenant Section of the Municipal Court.

Defendant was arraigned on the above-mentioned charges on September 3, 1971. Thereafter, the matter was listed for trial on several occasions. Prior to trial on May 17, 1971, the defense counsel filed an omnibus motion on behalf of defendant. This pleading included a motion to quash the indictments, a motion for bill of particulars, a prayer to release the recorded testimony taken before the grand jury as to the bills of August 1971, nos. 653 to 760, inclusive, and an appli-

---

[1] Notes of testimony, p. 20, before Judge Rosenwald.

[2] Notes of testimony, pp. 84-5.

cation for separate trials. The aforementioned motion was argued on August 10, 1972. The motion was denied by the Hon. Ethan Allen Doty, Administrative Judge of the Trial Division of the Common Pleas Court, on January 2, 1973.

This case was assigned for trial before the Hon. Thomas N. Shiomos, Judge of the Court of Common Pleas of Philadelphia County. The assignment was made as part of a special program referred to as an individual jury calendar. The assignment was made approximately in August of 1972.[3] Subsequently, a memorandum from Esther R. Sylvester, Chief of the Major Trial Division of the District Attorney's office, dated January 4, 1973, directed to the Hon. Edward J. Blake, the then Court Administrator (a carbon copy of which was sent to the Hon. Thomas N. Shiomos), set forth the fact that this matter was to be tried before the Hon. Thomas N. Shiomos *on a waiver of a jury trial.*[4]

Thereafter, the matter was listed for trial on three occasions. Defendant was finally brought to trial on Monday, August 20, 1973, before the Hon. Thomas N. Shiomos. The record of testimony taken before Judge Shiomos on August 20, 1973 discloses that the Commonwealth, by its Assistant District Attorney, Mr. D'Ambrosio, demanded a jury trial, notwithstanding the previous understanding and the fact that the Commonwealth does not have that right. After some colloquy, Judge Shiomos accepted the waiver of a jury trial.

Shortly after an unrecorded side bar conference, the court recessed until 11 a.m. at the request of the assistant district attorney.

---

[3] Notes of testimony, p. 26; notes taken as part of the proceedings before this court.

[4] A copy of the memorandum was attached to the original opinion.

Thereafter, on that day, upon resumption of the trial, the Commonwealth presented 12 witnesses who were confronted with direct, cross, and some with redirect and some with recross examination. The record further discloses that shortly before 3 p.m. the court recessed until the following day.

Subsequently, on the following day, August 21, 1973, the court reconvened at 10 a.m. The Commonwealth then presented the testimony of eight additional witnesses who were confronted with direct, cross, and some with redirect and one with recross examination. The court concluded the second day of hearing some time prior to 2 p.m. The Commonwealth had then presented the testimony of 20 witnesses and 21 exhibits.

The record further reflects that on the morning of Wednesday, August 22, 1973, the only proceedings that took place before the court regarding the matter was an argument concerning the admissibility of evidence. Some time later in the day, the court held an off-the-record conference in chambers attended by the assistant district attorney and defense counsel. It was at this time that the assistant district attorney informed the court that he had received information on Monday, August 20, 1973, from someone "he did not known who it was"[5] indicating that defendant at one time was employed in the Municipal Court as a landlord and tenant writ server;[6] that in that capacity he served under the supervision of the then Deputy Court Administrator Thomas N. Shiomos (now Judge Thomas N. Shiomos).

The court reconvened before the Hon. Thomas N. Shiomos on Thursday, August 23, 1973. Present were Arlen Specter, District Attorney of Philadelphia, As-

---

[5] Notes of testimony, p. 2, before Judge Shiomos.

[6] Defendant was not charged with having committed any offenses while performing his duties in this capacity.

sistant District Attorney George J. D'Ambrosio, and Louis Lipschitz, Esq., defense counsel. The following colloquy, inter alia, took place.

"MR. D'AMBROSIO: What had transpired, Your Honor, was that I received a telephone conversation indicating that Your Honor at some time in the past was a Deputy Court Administrator and had functions in a supervisory capacity over landlord and tenant writ service.

"THE COURT: That is not entirely correct. When I say 'entirely,' it was within the jurisdiction of the Municipal Court; that is, landlord-tenants became part of the MC system. They were under my supervision. They were under my control, so to speak, and Mr. Harry Clark was in charge of that. Of course, none of these men had offices there. Frankly, I think we only had about 20 or 30.

"Whatever application you have, I will hear.

"MR. LIPSCHITZ: May I also ask that the record show that Mr. D'Ambrosio told Your Honor that he had received this call on Monday afternoon, August 20, 1973. At that time trial of this case started on Monday morning. We continued with the trial on Tuesday, and we were going to continue with the trial on Wednesday.

"THE COURT: At any rate, the trial had begun Monday morning; is that correct?

"MR. D'AMBROSIO: That is correct, Your Honor.

"The Commonwealth did proceed with trial on Monday morning. It was not until after the trial had begun that I had received that information. I did not bring it to the Court's attention because on Monday afternoon I had no facts on which I could substantiate the statement made to me, and I didn't think it was proper for me to bring it to the Court's attention until I had substantiated it.

"THE COURT: I thought it was proper for you to do so. I am not concerned about that. I indicated to you in chambers that I would do what your office requested me to do if there was any indication of any impropriety. However, we have a problem.[7]

Further, the record reflects:

"MR. SPECTER: Our concern rises, Judge Shiomos, for the appearance of justice in the light of the prior contact which has been present in your capacity as Deputy Court Administrator. We face a very difficult and ticklish issue as to double jeopardy, and I do not believe it would be wise for my office to make a motion in this matter unless it were joined in by Mr. Lipschitz as counsel for the defendant, and I can understand the concern which Mr. Lipschitz has; and Mr. D'Ambrosio has advised me that Mr. Lipschitz is not willing to enter into such a motion. It is my view that the appropriate course for the District Attorney's office to follow is to call it to the attention of the court, and it is our suggestion for the appearance of justice—

"THE COURT: I understand.

"MR. SPECTER: Then I needn't—

"THE COURT: I do not foreclose your appearance here with regard to that matter. As a matter of fact, I will do it on my own motion. Certainly that would be more appropriate than your doing it on your own motion.

"MR. SPECTER: Judge Shiomos, I think that there may be a difference in terms of a conclusion from the trial judge sitting without any advocacy on the part of the Commonwealth. I have also, in the interest of— what is the standard?

"MR. D'AMBROSIO: Manifest necessity.

"THE COURT: Frankly, those are broad words, and

---

[7] Notes of testimony, pp. 3 and 4, before Judge Shiomos.

my concern is I have no hesitancy in doing it whatsoever. My only concern is the words 'manifest necessity.' I don't know if it would fall within that area.

"However, gentlemen, again, it is not on your motion—

"MR. SPECTER: I think, Your Honor, having studied cases, would come to the conclusion of manifest necessity as a very subjective matter.

"THE COURT: I would say this to you: I will do that. As a matter of fact, as I have indicated to you, I will do that. If Mr. Lipschitz appealed or whatever occurs in this entire matter, I don't know. I will take that position.

"MR. SPECTER: I would ask then if Your Honor, sua sponte, on your own motion, the matter having been called to your attention, decides on the course of the conduct as the court that it be on the record as your conclusion of . manifest necessity within the doctrine of court decisions so that your thinking is plain for the record.

"THE COURT: Frankly, I am just as capable of admitting it in open court. If we, shall I say, take the course where it results in an adverse decision, I will take full responsibility.

"MR. SPECTER: Well, I don't think—

"THE COURT: When I say that, I have no choice in the matter.

"MR. SPECTER: Judge Shiomos, I appreciate it. I don't think it is your full responsibility. I think we are working here in a complex area.

"THE COURT: I think your concern is in the eyes of the public that it might appear there was an indication of impropriety."[8]

Further, the record reflects, inter alia:

---

[8] Notes of testimony, pp. 5-8, before Judge Shiomos.

"MR. LIPSCHITZ: It is important that the record show that this was initiated by Mr. D'Ambrosio.

"THE COURT: The record also shows that. We have that clear.

"MR. LIPSCHITZ: I suggest that this is a subtle form of coercion that is being practiced here.

"THE COURT: Well, at any rate, let the record indicate that the Court, on its own motion, will withdraw a juror as a result of certain things that had been brought to the attention of this court in the interest of, shall we say, manifest justice. Therefore, I withdraw a juror and declare it a mistrial.

"MR. SPECTER: Judge Shiomos, you used the words 'manifest justice.' I think we have already covered your conclusions of manifest necessity.

"THE COURT: Yes, under the doctrine of manifest necessity.

"MR. LIPSCHITZ: If Your Honor please, manifest necessity is—

"THE COURT: Let us not go into the legal arguments. You will have your opportunity. I am not trying to foreclose you. I think this, unfortunately, has happened, and you have the famous saying, "Let the chips fall where they may."

"MR. LIPSCHITZ: Does Your Honor indicate that Your Honor could not dispose of this case impartially?

"THE COURT: That is not what I am saying. I don't think that the District Attorney here indicated that. I think the concern that, with some information that came to light, the public may also get that information and feel that anything that I have done had been unfair to the public, and, basically, that is why I am doing it.

"MR. LIPSCHITZ: They knew. They have known of Mr. Cohen's employment for over two years.

"THE COURT: All right, Mr. Lipschitz, you may argue that.

"MR. LIPSCHITZ: I just want this record to be complete, if Your Honor please, because whoever succeeds you in a trial of this case will have to dispose of this issue based on a record that has been presented here; and it may require further testimony, if Your Honor please, because I challenged Mr. D'Ambrosio's statement that he just heard of it on Monday afternoon. I asked him who it was that informed him. Mr. D'Ambrosio felt that because of the confidential relationship that he seems to have established with the informer, he was not at liberty to disclose the identity of that man. I think for the purposes of a complete record we should have the name and address of that individual, have him brought into court, and have him testify under oath because there is a difference in a situation, if Your Honor please, after we go to trial. . . ."[9]

Upon the conclusion of this colloquy, the court returned the case to the calendar room for reassignment to another courtroom.

The Hon. Curtis Carson, Judge of the Court of Common Pleas, then in charge of the calendar room, assigned this matter to the Hon. Julian King, judge of the same court. Judge Julian King returned this matter to Judge Carson for further reassignment because of some previous contact with defendant and previous association with the defense counsel. This matter was then assigned to this court.

Counsel for both the Commonwealth and defendant, and defendant himself, appeared before this court on nine separate occasions. During one of the appearances, defendant was arraigned for a second time,

---

[9] Notes of testimony, pp. 10-12, before Judge Shiomos.

pleaded not guilty to all bills of indictment. His counsel then interposed the plea of double jeopardy.

The court initially requested counsel for the parties, and counsel agreed, to confer with one another to present to the court a case stated. Counsel was granted numerous continuances by this court in an effort to have them accomplish this fact. The assistant district attorney finally informed this court that both counsel agreed on 90 percent of the factual situation. Despite numerous suggestions by the court that each counsel set forth his own understanding of the remaining portion of the factual situation as a footnote or in any other manner, the assistant district attorney refused to do so.

Counsel for the Commonwealth and defendant initially informed this court of the status of the matter. During the assistant district attorney's initial presentation on August 23, 1973, he stated, inter alia:

"[T]hat there was no accusation or insinuation by our office that Judge Shiomos was in any way, or would in any way act improperly with regard to the case; . . ."[10]

The assistant district attorney again reiterated this fact on September 26, 1973:

". . . we are not saying that there was any impropriety. . . . We're not saying that the Judge, during the course of this case, did anything during the course of this case that was improper or illegal, or immoral or anything of that sort."[11]

Further discourse by the assistant district attorney disclosed that defendant was interviewed by Chief of the County Detectives, Mr. Brophy, on May 28, 1971, and disclosed to the district attorney's office that he was also a writ server for the municipal court. This

---

[10] Notes of testimony, p. 13, before Judge Rosenwald.

[11] Notes of testimony, p. 82, before Judge Rosenwald.

was in addition to his being employed as a writ server for the traffic court.

Initially, the assistant district attorney informed Judge Thomas Shiomos that he received a "call" on Monday, August 20, 1973, after the first day of trial, that defendant was a writ server for the municipal court and that Judge Shiomos was the then deputy court administrator for the municipal court and, therefore, defendant's supervisor or administrator. Subsequently, this fact was reiterated to this court by the assistant district attorney:

"THE COURT: It was after Court . . . had recessed?

"MR. D'AMBROSIO: Yes, sir.[12]

Later, questioning elicited the following information:

"THE COURT: What time?

"MR. D'AMBROSIO: I don't know. Some time in the afternoon.

"THE COURT: Was it before Court?

"MR. D'AMBROSIO: No, it was in the afternoon— wait a second.

"MR. LIPSCHITZ: Tuesday we quit about 2:30 or a quarter to three, because Judge Shiomos had other matters scheduled at three o'clock.

"MR. D'AMBROSIO: I don't remember whether it was at the lunch break or after Court was over; I don't remember. It was not in the morning, I remember that. How many witnesses had testified on Tuesday?

"MR. LIPSCHITZ: On Monday and Tuesday."[13]

Subsequently, within a moment, Mr. D'Ambrosio returned to the court's chambers and made the following statement:

---

[12] Notes of testimony, p. 9, before Judge Rosenwald.

[13] Notes of testimony, p. 13, before Judge Rosenwald.

"MR. D'AMBROSIO: Your Honor, may I put one other thing on the record, please?

"THE COURT: Yes.

"MR. D'AMBROSIO: After we left here this morning, one of the other things I did was talk to Mr. Cunningham; I was somewhat upset. I wanted to make sure that everything I had told the Court is as I remembered it. And I sat down with Charlie and whatever I said, is this how you remembered it. As it so happens, Charlie was with me most of the time, there was one small area as to a difference that I wanted to bring to the Court's attention as to how he recalls the fact as to how I recall them. I don't know whether this will make any difference or not, but I wanted to bring it to the Court's attention, because I am not sure myself.

"The person, this informant referring to Your Honor as a person I have spoken to on the phone and seen this person on occasions, there is no question, and I am completely confident that this incident with regard to this informant took place on Monday afternoon, as is Mr. Cunningham. He, however, recalls that I originally saw him in person first. My recollection is that I spoke to him on the phone first.

"I still feel that it was on the phone first, but I just wanted to bring it to the Court's attention."[14]

The record of the notes of testimony discloses that the assistant district attorney never informed Judge Shiomos of the name of the informant.[15] Further, the record reflects that this court *repeatedly* requested the assistant district attorney and then ordered him to inform this court on the record or "in camera" of the name of the informant. The assistant district attorney refused to do so. In addition, the assistant

---

[14] Notes of testimony, pp. 35 and 36, before Rosenwald, J.

[15] Notes of testimony, p. 12, before Rosenwald, J.

district attorney refused to inform the court of any other personnel who assisted in the investigation and the length of time that they had been in the district attorney's office, despite an order to do so.

It is significant to note that the trial judge, *acting upon the suggestion of the district attorney,* and over the vigorous objection of defense counsel, declared a mistrial in this matter on his own motion. This was done on the fourth day of trial after some 20 witnesses and 21 exhibits had been presented to the court. There was no inquiry conducted by the trial judge concerning the verity of the district attorney's or assistant district attorney's statement of fact as to when the district attorney's office received the information which they presented to the court in their suggestion to the court to have the court declare a mistrial. In fact, there was no inquiry by the trial judge to determine whether or not the district attorney and the assistant district attorney or the district attorney's office knew or should have known that the trial judge was at one time administrator for the municipal court. Further, there was no inquiry conducted by the trial judge to determine whether or not defendant ever had any contact with the court prior thereto. The fact that the trial judge was the court administrator for the municipal court was public knowledge, common knowledge. In fact, it is and was *common knowledge* and *public knowledge* that the district attorney and the trial judge served together as assistant district attorneys, that the trial judge was a deputy court administrator in charge of criminal listings for the common pleas court and that the trial judge was then administrator to the municipal court. Mr. Specter, the then district attorney, knew or should have known of those positions which the trial judge held prior to his elevation to the bench as did many of his assistants and county detectives.

Further, there was a total failure by the trial judge to make a thorough inquisition into all surrounding facts and circumstances and exhaust all curative measures before he declared a mistrial.

The record of testimony reflects that the trial judge, in response to a statement made by the assistant district attorney, stated, inter alia:

"I indicated to you in chambers that I would do what your office requested me to do if there was any indication of any impropriety. However, we have a problem."[16]

Further, again in response to the assistant district attorney, the court stated, inter alia:

"THE COURT: Frankly, those are broad words, and my concern is I have no hesitancy in doing it whatsoever. My only concern is the words 'manifest necessity.' *I don't know if it would fall within that area.*" (Italics supplied.)[17]

Double jeopardy attaches if a mistrial is declared without "manifest necessity." See U. S. v. Jorn, 400 U. S. 470, 91 S. Ct. 547 (1971); U. S. v. Perez, 22 U. S. (9 Wheaton) 579 (1824); Downum v. U. S., 372 U. S. 734 83 S. Ct. 1033, 10 L. Ed. 2d (1963); U. S. v. Tinney, 473 F. 2d 1085 (3rd Cir., 1973); U. S. ex rel. Russo v. Superior Court of New Jersey, 483 F. 2d 7 (3rd Cir., 1973); Commonwealth v. Ferguson, 446 Pa. 24 (1971); Commonwealth v. John Wideman, 453 Pa. 119 (1973); Commonwealth v. Brooks, Appellant, 225 Pa. Superior Ct. 247 (1973).

Further, jeopardy attaches *in a case without a jury* when the accused has been subjected to a charge and the court has begun to hear the evidence: Newman v. U. S., 410 F. 2d 259 (D.C. Circ. 1969); Commonwealth v. Culpepper, 221 Pa. Superior Ct. 472 (1972).

---

[16] Notes of testimony, p. 4, before Judge Shiomos.

[17] Notes of testimony, p. 7, before Judge Shiomos.

The United States Supreme Court in Benton v. Maryland, 395 U.S. 784, 89 S. Ct. 2056, 23 L.Ed. 2d 707 (1969), held that the double jeopardy clause is applicable to the States through the Fourteenth Amendment. In Commonwealth v. Richbourg, 442 Pa. 147 (1971), the Supreme Court of Pennsylvania held that the Benton decision was fully retroactive. See also Ashe v. Swenson, 397 U.S. 436, n. 1 (1970).

Further, the courts have repeatedly held that "the manifest necessity doctrine as restated demands a thorough inquisition by the trial judge into all the facts and painstaking consideration of all possible cures short of trial abortion."[18] In addition, any doubt must be resolved in favor of the liberty of the citizen rather than left to the exercise of an unlimited, uncertain and arbitrary judicial discretion: Downum v. U.S., Com. v. Ferguson, Com. v. Brooks, supra.

A review of the record clearly establishes that the assistant district attorney repeatedly stated that the trial judge had not acted improperly, nor did anything improper or illegal or immoral or anything of that sort. During the assistant district attorney's initial presentation on August 23, 1973, he stated, inter alia:

"[T]hat there was no accusation or insinuation by our office that Judge Shiomos was in any way or would in any way act improperly with regard to the case; . . . ."[19]

Again, on September 26, 1973:

"[W]e are not saying that there was any impropriety. . . . We're not saying that the Judge, during the course of this case, did anything during the course

---

[18] Wake Forest Law Review (1972), p. 457. See also U.S. v. Jorn, U.S. v. Perez, supra; U.S. v. Walden, 448 F.2d 925 (4th Cir., 1971).

[19] Notes of testimony, p. 13, before Judge Rosenwald.

of this case that was improper or illegal, or immoral or anything of that sort."[20]

The record further discloses the following colloquy:

"MR. LIPSCHITZ: Does your Honor indicate that Your Honor could not dispose of this case impartially?

"THE COURT: That is not what I am saying. I don't think that the District Attorney here indicated that. I think the concern that, with some information that came to light, the public may also get that information and feel that anything that I have done had been unfair to the public, and, basically, that is why I am doing it."[21]

Under all the facts and circumstances of the instant case, this court is impelled to the conclusion that the trial of defendant should not have been aborted as no "manifest necessity" was evident and none ever existed.

It is to be regretted that the trial judge moved sua sponte, although such action was taken at the request and urging of the then District Attorney Arlen Specter.

"THE COURT: I thought it was proper for you to do so. I am not concerned about that. I indicated to you in chambers that I would do what your office requested me to do if there was any indication of any impropriety. However, we have a problem.[22]

"THE COURT: Frankly, those are broad words, and my concern is I have no hesitancy in doing it whatsoever. My only concern is the words 'manifest necessity.' I don't know if it would fall within that area."[23]

Defense counsel's motion for the discharge of defendant on the plea of double jeopardy is hereby granted and defendant is discharged.

---

[20] Notes of testimony, p. 82, before Judge Rosenwald.

[21] Notes of testimony, p. 11, before Judge Shiomos.

[22] Notes of testimony, p. 4, before Judge Shiomos.

[23] Notes of testimony, p. 7, before Judge Shiomos.