UNITED STATES of America,
Plaintiff-Appellee,

v.

David Robert IACOVETTI et al.,
Defendants-Appellants.

No. 71–2887.

United States Court of Appeals,
Fifth Circuit.

Aug. 31, 1972.

Rehearing Denied Oct. 5, 1972.

Max P. Engel, Miami, for De Rosa.

Lawrence E. Hoffman, Hoffman & St. Jean, Miami Beach, Fla., for Iacovetti.

Max Lurie, Miami, Fla., for Dentarmaro.

Joel D. Robrish, Miami, Fla., (Court-appointed), for Cardillo.

Joseph J. Balliro, Boston, Mass., for Dentarmaro and Waggenheim.

Robert W. Rust, U. S. Atty., Miami, Fla., Sidney M. Glazer, Eugene M. Propper, Crim. Div., Gary L. Betz, Spec. Atty., Beatrice Rosenberg, Atty., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before TUTTLE, COLEMAN and CLARK, Circuit Judges.

COLEMAN, Circuit Judge:

The individuals in this scenario were:

1. David Robert Iacovetti,

2. William Vito Dentarmaro, also known as Willie "D",

3. Anthony William De Rosa, also known as Tony Pulio,

4. Robert L. Cardillo,

5. Phillip Waggenheim,

6. Barry Glenn Lipsky.

De Rosa dismissed his appeal and Lipsky entered a plea of guilty, so the appellate cast is reduced to four.[1]

The indictment was in four counts, subsequently reduced to three.[2]  The defendants were charged with:

### Count I

Conspiring to violate and violating 18 U.S.C., §§ 2314 and 2315; 18 U.S.C., § 371;

### Count II

Knowingly, willfully, and unlawfully receiving, selling and disposing of 655 shares of American Express Company stock of the approximate ·value of $43,869.69, knowing the same to have been stolen, 18 U.S.C., §§ 2315 and 2;

---

1. De Rosa was indicted in the United States District Court for the Northern District of Illinois, entered a guilty plea and received a sentence concurrent to his sentence in this case. He subsequently dismissed his appeal in this case on December 28, 1971. Lipsky entered a guilty plea after the trial of the other defendants.

2. Count IV of the indictment was subsequently dropped.

### Count III

Willfully, knowingly, and unlawfully transporting and causing the same to be transported in interstate commerce from the State of New York to the State of Florida, knowing it to have been stolen in violation of 18 U.S.C., §§ 2314 and 2.[3]

A second trial resulted in a verdict of guilty on all counts for Cardillo and guilty on the first two counts for Dentarmaro, Iacovetti, and Waggenheim.

The appellants, along with secondary points, vigorously urge that the second trial infringed the prohibition against being twice put in jeopardy for the same offense, United States Constitution, Amendment V. We are compelled to disagree, and the convictions are in all respects affirmed.

### I

#### The Double Jeopardy Issue

The first trial began (Lipsky was then pleading not guilty) on December 7, 1970. The very next day, Vincent Teresa was testifying as a witness for the prosecution. Waggenheim's counsel called for the production of "Jencks" material prior to cross-examination. It was at this point that the fat began to get into the fire.

The trial court agreed and ordered the government to disclose the requested material before the termination of the direct examination of Teresa. Included in this material was the transcript of Teresa's grand jury testimony, with certain pages omitted which the trial court held did not have to be provided. This undelivered material contained information concerning a stolen check which showed a prior relationship between Teresa and Iacovetti's attorney.

On December 9, however, this excluded information was voluntarily given to appellants, apparently to avoid the possibility that defense counsel would inadvertently go into it during cross-examination of Teresa.

After receiving this information, all appellants except Iacovetti moved for a severance on the ground that they would be unable fully to cross-examine Teresa

3. § 2. Principals.
   (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
   (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
   § 371. Conspiracy to commit offense or to defraud United States.
   If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

   \* \* \* \* \*

   § 2314. Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting.
   Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud;

   \* \* \* \* \*

   Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

   \* \* \* \* \*

   § 2315. Sale or receipt of stolen goods, securities, moneys, or fraudulent State tax stamps.
   Whoever receives, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more, or pledges or accepts as security for a loan any goods, wares, or merchandise, or securities, of the value of $500 or more, moving as, or which are a part of, or which constitute interstate or foreign commerce, knowing the same to have been stolen, unlawfully converted, or taken;

   \* \* \* \* \*

   Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

because of his privileged relationship with Iacovetti's counsel.

Iacovetti asked for a severance in order to obtain other counsel. Dentarmaro and Waggenheim moved, in the alternative, for a mistrial. All counsel agreed that if Iacovetti's counsel became the subject of an accusation by Teresa, an inference adverse to their clients' interests would necessarily be raised.

The trial court stated his belief that it was "absolutely impossible to try Iacovetti in this case and to require Kessler to continue as counsel for Iacovetti because of all these situations that have developed and the possibility of future developments . . . .".

Lipsky's motion for severance was granted, the trial was ordered to proceed against him, and it was announced that the other appellants would be tried at a later date.

Upon being confronted with this development, the government claimed that this procedure would seriously prejudice its case against the other appellants. It therefore moved the trial court to grant a mistrial as to the other appellants and to try Lipsky at a time subsequent to their trial. Lipsky's counsel also expressed concern because his client would be "tied with them [the other appellants] with this jury". After the noon recess, Lipsky's counsel moved for a mistrial. The motion was granted.

Prior to the second trial appellants moved to dismiss the indictments on the ground that the second trial was precluded by the Fifth Amendment prohibition against double jeopardy. Motion denied.

## II

### The Second Trial

At the second trial Teresa testified that while vacationing in Miami, Florida, in March of 1969, he met with appellants Cardillo, Iacovetti, and Waggenheim at the Casa Luigi Restaurant. Teresa asked Iacovetti whether he knew anyone who would be in a position to pass stolen securities, i.e., to convert the securities into cash. Iacovetti replied that he would ask an acquaintance in a brokerage firm whether he could handle such securities.

A week later Teresa and the other men met again at the Casa Luigi. Iacovetti stated that he had spoken with a young man employed by a brokerage firm in Miami who was willing to do anything within reason to help out. However, Iacovetti said that the young man would have to be instructed as to what to do with the stolen securities.

A few minutes later, Barry Lipsky came over to the table where the men were sitting and Iacovetti introduced him as the young man who would pass the stolen securities. Dentarmaro and Waggenheim went to another table while Cardillo and Teresa explained that Lipsky was to open a brokerage account under an assumed name, through which the securities would be cashed.

Teresa, Cardillo, Waggenheim and Dentarmaro then went to the Thunderbird Hotel on Miami Beach where they met Anthony De Rosa and a man called "Frankie". In February it had been pre-arranged that De Rosa and Frankie would obtain and supply stolen securities. Frankie said that he would have to call New York, to check on the availability of stolen securities. Frankie placed a call to someone named "Jerry" and asked Jerry to fly to Miami with the stock which he had on hand.

The next day Teresa, Cardillo, Waggenheim, Dentarmaro, De Rosa, Frankie and Jerry met at the Thunderbird Hotel. Teresa selected certain stocks from among the securities which Jerry brought to Miami. Teresa, Waggenheim and Dentarmaro carried the securities Teresa had selected to Cardillo's home in Miami. Cardillo selected some American Express stock as the best for the purposes of their plan. Then Cardillo called Lipsky and arranged an appointment with him for Teresa to endorse the cer-

tificates in the name of "Paul McGaughy".[4]

That night all the appellants again met with Teresa at the Casa Luigi. Teresa told Iacovetti that the stocks had been given to Lipsky and they should be paid for the stocks in a short time. Later Teresa left the Miami area to appear in separate trials in Massachusetts and Maryland.

Approximately the first week of April, Cardillo telephoned Teresa in Baltimore, Maryland, and told him that the payment was ready. Teresa flew into Miami, met with Lipsky at a bank, and cashed two checks totaling over $43,800.

Assuring Lipsky that he would be paid his share of the proceeds later, Teresa went to the Thunderbird Hotel where he met with Cardillo, De Rosa, Dentarmaro and Waggenheim. The money was split into shares with everyone present receiving a share. Shares were also set aside for Lipsky and Iacovetti.

Other evidence consisted of registration cards of the Thunderbird Hotel which indicated that Waggenheim and Cardillo paid hotel bills on April 3, 1969, the same day they received their shares of the money.

### III

#### The Law of Double Jeopardy

At a very early date the Supreme Court confronted a double jeopardy issue, United States v. Perez, 22 U.S. 579, 9 Wheat. 579, 6 L.Ed. 165 (1824), opinion by Mr. Justice Story. A jury in a capital case had been unable to agree upon a verdict and had been discharged *without the consent of either the defendant or the prosecution*. The defendant then claimed that a second trial for the same offense would constitute double

jeopardy. This contention was rejected. The Supreme Court said:

"We think, that in all cases of this nature, the law has invested the courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound judicial discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution under urgent circumstances, and for very plain and obvious causes; and in capital cases especially, the court should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner."

This decision announced the governing principles in a case in which the defendant had not consented to the discharge of the jury.

Other Supreme Court cases on the subject are: Wade v. Hunter, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949); Gori v. United States, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961); United States v. Tateo, 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964); Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963) and Green v. United States, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1958).

For example *Wade* stated that in determining whether a trial should be terminated without judgment no abstract formula should be mechanically applied but all circumstances should be taken into account.

*Green* agreed that a second trial is not barred where unforeseeable circumstances arise during the first trial making its completion impossible.

---

4. Mr. McGaughy was the registered owner of the stock. The stock had been sent to New York from Atlanta, Georgia, to be broken down into smaller denomina-

tions. Mr. McGaughy testified that the endorsement on the certificates were not his.

*Gori* stated that where a trial judge is of the opinion that the ends of substantial justice cannot be obtained without discontinuing the trial then a mistrial can be declared even over the objection of the defendant [citing cases] 367 U.S. 364 at 368, 81 S.Ct. 1523.

One hundred and forty six years after *Perez* the Supreme Court had before it another double jeopardy case, United States v. Jorn, 400 U.S. 470, 475, 91 S. Ct. 547, 557, 27 L.Ed.2d 543 (1971) [argued and re-argued].

There, after reviewing the cases, including the customary quotation from *Perez,* supra, Mr. Justice Harlan, writing the plurality opinion stated:

> "Thus, where circumstances develop not attributable to prosecutorial or judicial overreaching, a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to re-prosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error." 400 U.S. at 485, 91 S.Ct. at 557.

To like effect, see Vaccaro v. United States, 5 Cir., 1966, 360 F.2d 606; United States v. Burrell, 6 Cir., 1963, 324 F. 2d 115, 119, cert. denied 376 U.S. 937, 84 S.Ct. 791, 11 L.Ed.2d 657.

■ The appellants here, for the reasons already stated, moved for severances, or mistrials, or both. They not only contended that this was for their benefit but urged that it was absolutely essential. They knew that, if granted, these motions would inexorably necessitate trial to another jury. That was what they were asking for, they got it, and having thus succeeded in their strategy they cannot now be heard to invoke the bar of double jeopardy.

Appellants argue that the mistrial is attributable to the government since the government should earlier have called to the attention of the court Teresa's implication of Kessler. But the Teresa-Kessler connection was wholly unrelated to the present charges and was neither part of the government's case nor germane to any possible defense. The government voluntarily called attention to the connection so that the matter would not inadvertently be touched upon by defense counsel. Thereupon the defense, insisting that it wanted to delve into the matter, convinced the judge that their rights would be prejudicated by the continuation of the trial. So, we reject this argument. See United States v. Pridgeon, 5 Cir., 1972, 462 F.2d 1094 [1972].

## IV
### *Other Assignments of Error*

#### A. Reading the Grand Jury Testimony

Lipsky's grand jury testimony was read to the jury at the request of appellants as part of their case, except Waggenheim later stated that he did not want the testimony considered as part of his defense. In questioning Lipsky *before the grand jury,* the prosecution stated that they had information that Lipsky met with Iacovetti and two others to arrange for the sale of the stolen stock.

In this situation, we apply the test stated by this Court in McMillian v. United States, 363 F.2d 165, 169 (5 Cir., 1966):

> "The inquiry should be whether the prosecutor's expression might reasonably lead the jury to believe that there is other evidence, unknown or unavailable to the jury, on which the prosecutor was convinced of the accused's guilt."

■ At the time the testimony taken before the grand jury was read to the trial jury, the prosecution had already presented its evidence and therefore the jury was aware of the reasons for the reference to the alleged Lipsky-Iacovetti meeting. Thus we hold that any possible error in the admission of this item was harmless beyond a reasonable doubt, Federal Rules of Criminal Procedure 52(a).

#### B. Motions for Severance

■ The denial of the motions for severance for Cardillo and Waggenheim was within the sound discretion of the trial judge. Absent a showing of prejudice resulting from the failure to grant

such a motion, the ruling will not be disturbed on appeal, Gordon v. United States, 5 Cir., 1971, 438 F.2d 858, cert. denied 404 U.S. 828, 92 S.Ct. 139, 30 L. Ed.2d 56; Tillman v. United States, 5 Cir., 1969, 406 F.2d 930.

Cardillo and Waggenheim contend they were prejudiced by their inability to call certain of their co-defendants to testify on their behalf. But neither Waggenheim nor Cardillo made a clear showing that these co-defendants would be willing to take the stand and give exculpatory testimony. Thus there was no abuse of discretion in denying the motions for severance, Smith v. United States, 5 Cir., 1967, 385 F.2d 34; United States v. Bethea, 3 Cir., 1971, 446 F.2d 30, cert. denied 404 U.S. 1003, 92 S.Ct. 572, 30 L.Ed.2d 556.

### C. Admission of Hotel Records

We are equally unimpressed with Cardillo's and Waggenheim's contention that the court erred in admitting the records of the Thunderbird Hotel without requiring a showing of their prior impecuniosity. These records indicated that on April 3, 1969, the day the money received from the sale of the stolen securities was divided, hotel bills amounting to $203.32 for Waggenheim and to $1500 for Cardillo were paid.

Since there is other evidence of the guilt of the appellants and since the acquisition of the money was the natural fruit of the crime, evidence showing a sudden increase in wealth of the accused without a prior showing of impecunious circumstances is admissible, United States v. Manning, 5 Cir., 1971, 440 F.2d 1105, cert. denied 404 U.S. 837, 92 S.Ct. 125, 30 L.Ed.2d 69; United States v. Crisp, 7 Cir., 1971, 435 F.2d 354.

### D. Admission of Telephone Conversation

Iacovetti contends that the trial court erred in allowing Teresa to testify concerning a telephone conversation between himself and Teresa several days after the proceeds of the conspiracy had been divided. This telephone conversation, initiated by Teresa, was to ascertain whether Iacovetti had received his share of the money which was left with Cardillo.

Where, as here, the criminal aim of a conspiracy is to make a profit by illegal means, such a conspiracy continues until the fruits of the crime have been disposed of. Consequently, conversations concerning the payment of the money here involved are not inadmissible on the ground that such conversations took place after the completion of the conspiracy, United States v. Sopher, 7 Cir., 1966, 362 F.2d 523, cert. denied 385 U.S. 928, 87 S.Ct. 286, 17 L.Ed.2d 210; Atkins v. United States, 9 Cir., 1962, 307 F.2d 937.

### E. Sufficiency of the Evidence

In support of his contention that there was insufficient evidence to sustain his conviction, Iacovetti claims that as a matter of law the testimony of Teresa was unbelievable and therefore not sufficient to support a conviction.

Admittedly, Teresa's testimony constituted the crucial evidence against Iacovetti. However, the uncorroborated testimony of an accomplice is sufficient to support a conviction in the federal courts if it is not on its face incredible or otherwise unsubstantial, United States v. Prentiss, 5 Cir., 1971, 446 F.2d 923; United States v. Bays, 5 Cir., 1971, 448 F.2d 977; United States v. Stanley, 5 Cir., 1970, 433 F.2d 637; Tillery v. United States, 5 Cir., 1969, 411 F.2d 644.

The trial court, realizing that Teresa was admitting complicity and had admitted that he was in a position to gain favors from the government by his testimony, properly charged the jury to accept his testimony with great caution and to weigh it with care. Thereafter his credibility and the weight accorded to his testimony were issues to be decided by the jury, United States v. Stanley, *supra*.

Iacovetti also contends that his conviction cannot be sustained because he did not have knowledge of the interstate character of the stock and consequently

# 1154

could not have intended to commit a federal crime. Should the plan have been to sell stolen securities which had been transported in or stolen from *intrastate* commerce, Iacovetti might have been guilty of conspiring to steal or sell, acts which only constitute violations of state law.

However, all participants in this conspiracy, including Iacovetti, had an all encompassing disregard as to whether the stolen securities had an interstate or an intrastate character. They were only concerned about their sale. There was no showing that the conspiracy was part of a plan to sell stolen securities which were only of a local nature.

Where the plan, as in this case, is to sell stolen securities, regardless of whether they have an interstate or intrastate character, we believe that the scope of the conspiracy can be found broad enough to imply intent to commit a federal crime such as in Nassif v. United States, 8 Cir., 1966, 370 F.2d 147, cited with approval in United States v. McGann, 5 Cir., 1970, 431 F.2d 1104, 1108, cert. denied 401 U.S. 919, 91 S.Ct. 904, 27 L.Ed.2d 821.

When the evidence of a conspiracy is shown, only slight additional evidence is required to connect a particular defendant with that conspiracy, United States v. Morado, 5 Cir., 1972, 454 F.2d 167; United States v. McGann, *supra.* After viewing the evidence in this case in the light most favorable to the government, as we are required to do on appeal, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 87 L.Ed. 680 (1942), we hold that there was sufficient evidence to implicate Iacovetti with the overall conspiracy.

The convictions of all appellants are Affirmed.

## ON PETITION FOR REHEARING BY THE COURT:

It is ordered that the motion of appellant, Robert L. Cardillo, for an extension of time for the filing of a petition for rehearing up to and including September 18, 1972 is hereby granted.

It is further ordered that said petition for rehearing shall be and the same is hereby denied.

## PER CURIAM:

It is ordered that the petitions for rehearing filed in the above entitled and numbered cause on behalf of David Robert Iacovetti, William Vito Dentamaro, and Phillip Waggenheim be and the same are hereby denied.

We specially note the strong and repeated assertions, on the petition for rehearing as well as in the original briefs, that the evidence was insufficient to show that Iacovetti knew "that the plan was to sell securities which would pass interstate". These protestations, on petition for rehearing, justified a fresh re-examination of the trial record.

This re-examination directed our attention to the following facts:

1. The first discussion of the securities at the Casa Luigi Restaurant in March, 1969, involved Iacovetti, Teresa, Cardillo, and Waggenheim. The others asked Iacovetti if he knew anyone in a brokerage firm that would help them move stolen securities. Iacovetti was very much concerned about how much trouble might be involved [T.R., 70–71];

2. At another meeting at the Casa Luigi, with Iacovetti, Teresa, Waggenheim, and Cardillo present, Iacovetti introduced the group to the stockbroker Lipsky. Again Iacovetti was much concerned about how much trouble was involved and asked several questions to insure that Lipsky would not be in danger of being found out [T.R., 72–76];

3. At another meeting at the Casa Luigi, when Iacovetti, Teresa, Cardillo, Willie "D", and Waggenheim were present, Teresa told Iacovetti that he had signed the stocks and that everything was all right [T.R., 110];

4. Teresa testified that from the time he first met Lipsky until the time that he turned the stolen stock certificates over to him he saw Iacovetti every night in the Casa Luigi [T.R., 227].

As was pointed out in the original opinion in this case, the same night that

Iacovetti introduced the remaining participants to Lipsky, the stolen securities were ordered down from New York (although not in Iacovetti's presence), arrived the next day, and Lipsky was called immediately. When the proceeds of the sale of the stolen stock were divided at the Thunderbird Hotel Cardillo, De Rosa, Dentamaro, and Waggenheim set aside shares of the spoils for Lipsky and Iacovetti.

In addition to that recited in the original opinion, this testimony left the jury in position to infer from all of the evidence beyond a reasonable doubt that Iacovetti understood the interstate aspect of his activities. Iacovetti was involved in the operation from the start, he was very solicitous to see to it that neither he nor Lipsky would get into any trouble, and he was in daily contact with Teresa until the stocks were actually turned over to Lipsky, the man he had brought into the illegal operation.

Therefore, with due regard for the vigorous efforts of counsel on this point, the argument as to Iacovetti is rejected.