**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Nathan George DINITZ, Defendant-
Appellant.**

**No. 73-2109.**

United States Court of Appeals,
Fifth Circuit.

April 4, 1974.

Rehearing En Banc Granted
June 10, 1974.

**54**

Fletcher N. Baldwin, Jr., Univ. of Fla. College of Law, Gainesville, Fla. (Court-appointed), for defendant-appellant.

William H. Stafford, Jr., U. S. Atty., Robert L. Crongeyer, Jr., Nick P. Geeker, Asst. U. S. Attys., Pensacola, Fla., for plaintiff-appellee.

Before BELL, DYER and CLARK, Circuit Judges.

CLARK, Circuit Judge:

### I.

Nathan George Dinitz was convicted of violating 21 U.S.C. § 846 by conspiring to distribute a schedule I controlled substance (LSD) and of violating 21 U. S.C. § 841(a)(1) by distributing LSD. Dinitz's first trial ended in a mistrial. He contends that retrying him violated his fifth amendment rights against double jeopardy. Because we agree that the retrial constituted double jeopardy, we do not reach any of the other arguments Dinitz advances.

Like almost all mistrial-double jeopardy cases this one turns on the facts of its particular procedural context. Illinois v. Somerville, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). Dinitz was charged with participating in a sale of LSD to Steve Cox, a government informer. He initially employed Attorney Jeffrey Meldon to represent him. Meldon appeared with him at arraignment and filed numerous pretrial motions. Approximately five days before Dinitz's trial, Attorney Maurice Wagner was hired to act as lead counsel and conduct the trial. Wagner had not been admitted to practice before the Northern District of Florida, but the court allowed him to appear *pro hac vice* in Dinitz's case. Meldon was also present at trial along with a professor of law from the University of Florida,[1] as counsel for Dinitz. After the jury had been sworn and the government had made its opening statement, Wagner began an opening statement in behalf of Dinitz. The crux of the government's case on both counts was to be the testimony of agent Cox as to the circumstances of his purchase from Dinitz. Wagner's trial strategy was to attack the credibility of Cox, and a part of this strategy was to put before the jury at the outset the idea that Dinitz had been "set up" with the sale to Cox as a predicate for a subsequent extortion attempt. Wagner intended to of-

---

1. The professor, Fletcher Baldwin, advised the court at the outset of the proceedings that he was not a trial attorney and would not actually participate in Dinitz's trial. He did brief and argue the instant appeal.

fer proof that a week after his arrest Dinitz had received a phone call from someone who offered to arrange for all charges to be dropped if Dinitz would pay over a certain amount of money. Obviously, Wagner hoped the jury would infer from this evidence either that Cox was the extortionist or that he had some part in the scheme. Ample proof of the attempt at extortion was known to be available to the defense but, as it subsequently developed, no connection between Cox and the extortion attempt could ever be demonstrated.[2] In the early part of his opening statement, Wagner started an attack obviously aimed at Cox.

Mr. Wagner: After working on this case over a period of time it appeared to me that if we would have given nomenclature, if we would have named this case so there could be no question about identifying it in the future, I would have called it the case—

Mr. Reed (Asst. U. S. Attorney): Your honor, we object to personal opinions.

The Court: Objection sustained. The purpose of the opening statement is to summarize the facts [that] the evidence will show [and] state the issues, not to give personal opinions.

Mr. Wagner: Thank you, your honor. I call this the case of the incredible witness.

The jury, then, was removed from the courtroom and the court warned Wagner in the following terms:

The Court: You appeared at this trial late, you showed up, you were not counsel of record, you have never filed an appearance. This court was not aware of your participation until the jury was to be selected. I do not approve of your behavior and if you attempt to bait this court once again I am going to refuse to allow you to practice law in this court again.

Wagner then continued with his opening statement, bringing his chronological recitation of what the evidence would show up to the time of the indictment. At that point he began this statement: "some week or ten days later Nat [Dinitz] began to get telephone calls offering —." The government's objection again caused the jury to be removed from the courtroom. In the jury's absence the court asked Wagner what he was about to discuss. He responded that he was going to discuss the extortion attempt against Dinitz. The court demanded that he demonstrate that he had proof that Cox was the man who picked up the parcel at the trash container. When it became apparent that the defense had no such proof, the following exchange transpired (still in the absence of the jury):

The Court: You will leave this courtroom immediately and you will never practice law in this court again Mr. Wagner. I direct you to leave now. Mr. Marshal, see that he leaves the building immediately . . . . [Wagner departs]. This is the worst exhibition I have ever heard of since I have sat on the bench. It is plain character assassination, and I hope Mr. Meldon that you are not responsible for any part of it. I will ask you now if you are. Did you discuss with Mr. Wagner what his opening statement was going to consist of and the evidence that he was going to attempt to put before this jury with respect to those phone calls and extortion attempts?

2. Dinitz had promptly reported the extortion attempt to the Federal Bureau of Investigation and, at the suggestion of the FBI, an envelope was filled with paper and placed underneath a large trash container at the supposed pick-up spot. Johnson, an FBI agent, in an attempt to catch the extortionist kept the trash container under surveillance and reported that he saw someone pick up the envelope but was unable to apprehend the pick-up man. However, Johnson was able to describe the physical appearance of the man picking up the envelope and the subject did not in any way resemble Cox.

Mr. Meldon: Your honor, I did not prepare the opening statement, and Mr. Wagner prepared his opening statement independently.

The Court: This is the worst exhibition I have seen. I am going to inquire of you further as to your knowledge of what Mr. Wagner was attempting to do. Mr. Wagner knew without doubt that this was inadmissible, highly prejudicial and nothing but character assassination, and I am going to inquire of you further, and if I find that you had anything to do with it I am going to take further action in your regard, too.

After the Assistant U. S. Attorney interjected that Meldon might well have been aware in advance of Wagner's intended trial tactics, the court continued to address Meldon as follows:

The Court: All right, convince me, Mr. Meldon, that you had no control over Mr. Wagner. You were the lead counsel in this case. Apparently, you called him in to be associated with you. Explain to me that you had no control over his activities and had no knowledge that he was planning to present this case in this manner.

Meldon thereupon denied ever telling Wagner that Cox was the extortionist and disclaimed any responsibility for Wagner's planned opening statement. The court then inquired of Meldon if he was prepared to proceed at that time, whereupon the following exchanges occurred:

Mr. Meldon: The Defendant has stated to me that since I was not hired to argue the case he is in a quandary because he hired Mr. Wagner to argue the case and he feels he needs more time to obtain outside counsel to argue the case for him.

The Court: That comes too late. You are his counsel and have been. I will consider it between now and 9:00 o'clock tomorrow morning.

\* \* \* \* \* \*

Mr. Meldon: I need additional time to prepare in that I have not discussed it with the witnesses and Mr. Wagner has done all of the preparation.

The Court: It is your responsibility to contact your witnesses and discuss this case with them between now and 9:00 o'clock tomorrow morning, because that is when we will continue.

At 9:00 the following morning in chambers Meldon again advised the court that Dinitz did not want him to try the case and that in any event, he was unprepared to take the lead in the trial at that time. The judge advised counsel that he did not think that the government or the defendant could get a fair trial and stated that he was seriously considering granting a mistrial. He then declared a thirty minute recess and requested counsel for both sides to consider the alternatives. After the recess, the transcript shows this colloquy:

Mr. Weldon: Your Honor, I have conferred with the Defendant and he wishes to move for a mistrial at this time and after full consideration of the situation and an explanation of the alternatives before him, he feels that he would move for a mistrial and that this would be in his best interest.

The Court: What does the Government have to say?

Mr. Crongeyer: Your Honor, we have discussed this at some length and we think that for the reasons you have set forth already on the record a mistrial might be appropriate in this case, and the Government would not oppose a mistrial.

The Court: Then I am going to declare a mistrial, gentlemen. I think under all of the circumstances in this case that it would be in the interest of justice to declare a mistrial and that is what I plan to do.

Subsequently, the court granted Meldon leave to withdraw as Dinitz's counsel. Prior to his second trial, Dinitz

moved to dismiss the indictment on the basis of double jeopardy and alternatively to have Wagner reinstated as his trial counsel, but both motions were denied. At his second trial Dinitz represented himself and was convicted on both counts in the indictment.

## II.

■ United States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824) is the customary starting point for determining whether retrial following a preverdict discharge of the first jury violates the defendant's fifth amendment rights against double jeopardy.[3] In Perez, a murder case, the trial judge acting sua sponte granted a mistrial after the jury was unable to agree on a verdict. The Supreme Court per Mr. Justice Story, in the course of holding that the fifth amendment's double jeopardy clause did not prohibit retrial stated, "[w]e think that in all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict whenever in their opinion, taking all the circumstances into consideration, there is manifest necessity for the act, or the ends of public justice would otherwise be defeated." This rule represents a balancing on the one hand of a criminal defendant's valued right to complete his trial before a particular jury, United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); and on the other, society's interest in fair trials and preventing "the guilty from going free", Smith v. Mississippi, 478 F.2d 88 (5th Cir. 1973). Inspired by language in Perez, subsequent cases have consistently applied this test on a case by case basis and refused to catalogue specifically the circumstances in which the declaration of a mistrial would be supported by

"manifest necessity" or the "ends of public justice." [4]

Last year in Illinois v. Somerville, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973) the Court distilled from previous cases a "general approach" to mistrial-double jeopardy cases premised on the "public justice" policy of Perez. See also Smith v. Mississippi, supra, and McNeal v. Hollowell, 481 F.2d 1145 (5th Cir. 1973). One line of cases holds that a mistrial is proper "if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial." Another supplementary line of cases forbids the granting of a mistrial on the basis of any ruling or procedure which would lend itself to prosecutorial manipulation. See, Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963); McNeal v. Hollowell, supra; and United States v. Cheung, 485 F.2d 689 (5th Cir. 1973).

■ Notwithstanding the requirements of Perez for mistrials granted sua sponte or at the prosecution's behest, "where circumstances develop not attributable to prosecutorial or judicial overreaching, a motion by defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error." United States v. Jorn, supra, 400 U.S. at 485, 91 S.Ct. at 547, 557, 27 L.Ed.2d at 543 (1971). Thus, even if manifest necessity for a mistrial is lacking, in the absence of prosecutorial or judicial overreaching, a defendant's motion for or consent to a mistrial normally removes any double jeopardy barrier to reprosecution. United States v. Iacovetti, 466 F.2d 1147 (5th Cir. 1972), cert. denied, 410 U.S. 908, 93 S.Ct. 963, 35 L.Ed.2d 270

---

3. The fifth amendment's double jeopardy "prohibition is not against being twice punished, but against being twice put in jeopardy," United States v. Ball, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896). Thus, jeopardy can attach before a trial is completed, and the Supreme Court has held that in a jury

trial jeopardy attaches when the jury is impaneled and sworn. See e. g., Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963).

4. For examples of cases see note, Twice in Jeopardy, 75 Yale L.J. 262 (1965).

(1972); United States v. Beasley, 479 F.2d 1124 (5th Cir. 1973); and United States v. Romano, 482 F.2d 1183 (5th Cir. 1973) [1973]. However, the mere fact of consent does not have such talismanic qualities that "mere mouthing of the motion (mistrial motion) in open court constitutes in every case waiver of a subsequent plea in bar." United States v. Walden, 448 F.2d 925 (4th Cir 1971).

### III.

The instant case is an unusual one indeed, and its unique facts must be placed in proper perspective before these legal principles can be applied. After Wagner's banishment and the court's explicit threats to deal severely with Meldon if he had ever been aware of Wagner's proposed opening statement, the court was faced with three possible courses of action: (1) it could have proceeded with trial; (2) it could have granted a continuance and reconvened with the same jury at a later date;[5] (3) or it could have declared a mistrial.

Proceeding with the trial would have been so altogether unreasonable as to carry the probability of a reversal on appeal. *See Somerville, supra.* The court's expulsion of Wagner left Dinitz without the counsel he had employed to lead the conduct of his defense. The threats to Meldon placed the only remaining trial attorney in the inconsistent position of having to protect his own standing as a member of the bar of the Northern District of Florida against any suggestion of complicity with the line of defense Wagner had begun and

of acting as a vigorous and effective advocate on behalf of Dinitz. Additionally, Meldon had not prepared himself to try the case, and, after Wagner's dismissal, Dinitz made it clear that he did not want Meldon to represent him.[6]

The second course, a continuance of sufficient length to permit the employment of new counsel was also unreasonable and would likewise have failed *Somerville's* "general approach." There would have been a very real probability of prejudice inherent in releasing the jurors to go about their normal affairs in contact with the general public and news media for such a period of time. Sequestering them would have been out of the question. Additionally, the break in the continuity of the trial would poorly serve juror's memories. Most importantly, however, a continuance would saddle Dinitz with the unfavorable inferences the jurors would surely draw from the delay itself and from Wagner's absence at the rescheduled trial.

Usually, the declaration of a mistrial is contemporaneous with the event which in the court's judgment operates to make a mistrial necessary. As a result, the appellate court normally tests to determine whether the precipitating event created the requisite manifest necessity to abort the trial. The instant case does not fit this mold. The actions of the court in banishing Wagner and threatening Meldon inexorably led the trial down the path to mistrial. As the government forcefully argues manifest necessity was present when the mistrial was finally granted, but we would be wrong to focus the inquiry there.[7] The die was cast with the trial judge's response to the conduct of defense counsel.

---

5. The continuance would have had the effect of a mistrial if the same jury was not reconvened, since jeopardy attaches when the jury is sworn, see footnote 3, supra.

6. Dinitz, a third year law student at the time, was similarly unprepared to represent himself.

7. The government argues and the trial judge indicated that there might have been other

grounds for granting the mistrial at the time it was granted. The case had been highly publicized, and it had been reported to the court before trial that some of the jurors had overheard a comment potentially prejudicial to Dinitz by a security guard. However, the court was aware of these reasons long before Wagner was excluded and if it thought them sufficient to warrant granting of a mistrial, it would have acted earlier.

Before testing the validity of this response, we must resolve the threshold issue of whether Dinitz's consent to the mistrial operated to bar his subsequent double jeopardy plea.[8] If it did not so operate, we must then determine whether what the trial judge did at the time of Wagner's disbarment met the manifest necessity requirements of *Perez* and *Somerville*.

## IV.

■ When Dinitz consented to a mistrial did he bar himself from raising the double jeopardy issue? In answering this question we need not characterize the trial judge's actions as judicial overreaching which under *Jorn, supra,* would allow Dinitz to plead double jeopardy notwithstanding consent on his part. Using a defendant's consent to a mistrial to bar his subsequent complaint of double jeopardy implies that he has bound himself to accept an abandonment of the first trial by exercising something more substantial than a Hobson's choice. If a defendant is able to continue the trial even though harmed by prosecutorial or judicial error, but desires to abort that proceeding, he has waived his right to proceed before the jury first selected. In the instant case, however, the actions of the trial judge had the effect of rendering Dinitz unable to conduct his defense. With Wagner excluded and Meldon disabled, Dinitz had no choice but to move for or accept a mistrial. Under the circumstances of this case, see United States v. Walden, *supra,* he can hardly be said to have relinquished voluntarily his right to proceed before the first jury.[9]

## V.

■ Since the court's actions at the time of Wagner's banishment made the subsequent grant of a mistrial inevitable, appellate review must center on these actions rather than on the resulting declaration. Dismissal of an attorney in the midst of a criminal trial is not per se wrong. The discretion reposed in the trial court to see that the proceedings before it accord justice to the litigants is, in the abstract, broad enough to encompass such a removal. For example, if defense counsel by his actions so prejudices the jury trying his client that manifest necessity exists to declare a mistrial; he may be expelled and a mistrial declared. The fact that the mistrial may be attributed to the absence of counsel is of no moment. Despite such formal characterization, the ultimate cause of the mistrial remains the counsel-provoked jury prejudice. Additionally, it is possible that an attorney's conduct can be so disruptive of the orderly processes of justice as to require his removal from the proceedings and an ensuing mistrial. Again, the manifest necessity for declaring a mistrial would be found in the state of affairs created by counsel before the court takes action. Here our scrutiny must first be directed to the impact on the jury of Wagner's activity at this point to determine if jury prejudice can sustain the ousting of Wagner and the threats of a similar fate for Meldon.

■ Wagner's conduct beginning with the motion to suppress and ending with the phone call statement had required retiring the jury from the courtroom several times. Although these in-

8. We do not reach Dinitz's argument that Meldon's position of divided loyalty between representing his client and protecting his own interests operated to require a personal consent from Dinitz to the mistrial. *Cf.* Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed.2d 680 (1942).

9. Judge Bell incorrectly premises his dissenting remarks upon the supposition that we have either misread or misunderstood *Jorn.* As his analysis of the law of that holding shows, that is not the source of our difference. Rather, it is purely due to fact analysis. For emphasis, we reiterate that this record discloses to us that the trial judge's response to the conduct of defense counsel deprived Dinitz's motion for a mistrial of its necessary consensual character.

térruptions were vexatious, it certainly cannot be said that, individually or cumulatively, they would·have made an impartial verdict impossible. See *Somerville, supra.* Furthermore, we recognize that Wagner was guilty of improper conduct when, despite the court's ruling, he "labeled" the proceeding as the case of the incredible witness. However, this transgression had been corrected before the jury and was past when Wagner's comment about a post-arrest phone call to Dinitz was stopped in mid-sentence by an objection. This record contains no intimation that the trial judge thought the jury had been prejudiced by Wagner's mistakes of conduct up to the time they were excused upon the government's objection to the phone call statement. Even at that point the court's only expressed concern was to determine whether the *anticipated* comment was one that could be supported by admissible evidence. Even if we were to assume that counsel's actions were intended to affect the jury, the facts in the record at this time will not permit justifying the mistrial because of jury prejudice, for this jury never heard the matter which the judge termed "character assassination." [10] If the court below considered that the jury in the first case had been prejudiced by Wagner's conduct up to this point, such prejudice could have been cured by a cautionary instruction. This being so, the existence of such curable prejudice would not support a mistrial. *See* Carsey v. United States, 129 U.S.App.D.C. 205, 392 F.2d 810 (1967).

In United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971), the court based its holding that the mistrial· was not supported by manifest necessity on the trial judge's failure to consider other alternatives. *See also* United States v. Cheung, *supra.* In the instant case, the court had not ruled on the mat-

ter of the admissibility or permissibility of the extortion attempt line of defense. Except for his single lapse in the "incredible witness" comment, Wagner had not demonstrated an unwillingness to comply with the court's rulings. Thus an obvious alternative to disbarring Wagner and precipitating a mistrial would have been a ruling prohibiting reference to the extortion attempt and a warning to Wagner against future interjection of this matter without first establishing a valid basis in proof. In United States v. Whitlow, 110 F.Supp. 871 (D.C.D.C.1953) the court held that the defendant's rights against double jeopardy would be violated by retrial, after a mistrial, because the defendant's attorney had exceeded the bounds set by the court in examining witnesses. In *Whitlow* the court stated that grant of a mistrial for misconduct of defense counsel would not be proper except in case of misconduct going to the very vitals of the trial itself. "Minor misconduct of defense counsel, such as overstepping the limits set by the court for the examination of the witness, does not under the authority warrant a mistrial, thereby depriving the defendant of his right to secure a verdict from the jury that has been sworn to try him." 110 F. Supp. at 876.

■■ Assuming for the sake of argument Wagner was engaged in a deliberate, contemptuous course of baiting the court and improperly attempting to assassinate the character of the principal prosecution witness, still no manifest necessity for his immediate dispatch would have existed.[11] Such misconduct could never be condoned, but insofar as the trial then in progress was concerned, other alternatives available to the trial judge had to be considered. *See* United States v. Jorn, *supra.* For example, the judge could have warned Wagner that he would be cited for contempt if such

---

10. In making this determination we have not failed to give full consideration to the trial judge's superior opportunity to observe the effect of particular statements on the jury. *See, e. g.,* Gori v. United States, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961).

11. It is not at all clear that the discord between the court and Wagner was not the result of a basic misunderstanding. The court

was only concerned with the existence of proof that the undercover agent Cox was the same man who had picked up the bundle left for the extortionist. If the court ever considered that Wagner may have been urging a broader contention—that Dinitz had been set up for the criminal contact with Cox in order to enable someone, not necessarily Cox or a confederate, to extort funds from him—it is not apparent from the transcript.

practices continued. He could have actually cited him for contempt and imposed post trial sanctions for each citation, if he thought Wagner's conduct amounted to obstructing the performance of his judicial duty. *See* 18 U.S.C. § 401; and In re McConnell, 370 U.S. 230, 82 S.Ct. 1288, 8 L.Ed.2d 434 (1962). The trial judge could have caused a complaint to be filed with the grievance committee of the state bar or taken post trial steps to prevent him from being admitted to practice before the Northern District of Florida. In view of these and any other alternatives which would not affect the ability to continue the trial, we cannot say that there was manifest necessity for the trial judge's actions.

We have carefully read and reread the record and, although Wagner's conduct was far from exemplary and may have justified disciplinary action, we cannot conclude that taken separately or together his mistakes vested the court with discretion to deprive his client of representation in this criminal case. For emphasis, we reiterate our refusal to rule that there are no circumstances in which such a midstream disbarment would be proper. Similarly, we caveat that we do not intend to fashion any rule which would permit obstructionary conduct by defense counsel, any attempt to create a mistrial, or the adoption of a trial strategy of creating jury prejudice. Evidence of such reprehensible practices would present a different case. We hold only that Wagner's actions did not rise to the malevolent level of creating incurable jury prejudice or requiring the banishment of counsel from the courtroom to preserve the orderly processes of justice. Adequate alternatives were available to deal with the errors which did not require sacrificing of the defendant's ability to continue his defense.

Reversed.

BELL, Circuit Judge (dissenting):

I respectfully dissent. Two basic precepts in a system of criminal justice are (1) that it be a workable institution and, (2) that it be administered in an even handed manner. The majority opinion violates both precepts. It distorts the application of the Double Jeopardy Clause of the Constitution to the extent of burdening the system, and the only result of the distortion is a windfall to defendant Dinitz.

The distortion arises out of misconception on the part of the majority as to how the Double Jeopardy Clause is to be administered. In United States v. Jorn, 1971, 400 U.S. 470, 91 S.Ct. 547, 27 L. Ed.2d 543, the court was concerned with a case where the double jeopardy bar was claimed because of the grant of a mistrial by the trial court on its own motion. The test applied was that of whether the trial court abused its discretion. The majority applies the same test here, apparently giving no consideration to the different rule that obtains when the defendant seeks the mistrial. The *Jorn* decision points up the difference in its discussion of the policy underlying the application of the Double Jeopardy Clause. The right involved is that of a defendant to have his trial completed by a particular tribunal. In adverting to circumstances when reprosecution is allowed or not allowed, the court draws the distinction between those instances when the defendant gives up his option to have the cause determined by the first jury such as by motion for mistrial, a new trial, or by appeal, and those instances where the court deprives the defendant of such option. The court said:

"If that right to go to a particular tribunal is valued, it is because, independent of the threat of bad-faith conduct by judge or prosecutor, the defendant has a significant interest in the decision whether or not to take the case from the jury when circumstances occur which might be thought to warrant a declaration of mistrial. Thus, where circumstances develop not attributable to prosecutorial or judicial over-reaching, a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error." 400 U.S. at 485, 91 S.Ct. at 557.

The court explicated the prosecutorial or judicial overreaching situation by commenting that in such cases reprosecution might well be barred despite the defendant having made a motion for mistrial.

400 U.S. 485, n. 12, 91 S.Ct. 547. *Jorn* goes on to point out that in the absence of a motion for mistrial by the defendant, manifest necessity for the mistrial must appear. It was under the manifest necessity doctrine that the court applied the abuse of discretion test.

Here we have a motion by defendant for a mistrial and the error of the majority is seen in the avoidance of determining whether there was judicial overreaching on the part of the district court as distinguished from judicial error (equated by the majority opinion with an abuse of discretion).[1] Under the teaching of *Jorn*, this issue cannot be avoided. The majority is correct in applying the double jeopardy bar if there was in fact judicial overreaching. The majority is in error if the conduct of the district court fell short of judicial overreaching.

This posture of the case for decision is demanded by our own decisions following *Jorn*. *See* United States v. Romano, 5 Cir., 1973, 482 F.2d 1183, 1187–1188; United States v. Beasley, 5 Cir., 1973, 479 F.2d 1124, 1125–1126; United States v. Iacovetti, 5 Cir., 1972, 466 F.2d 1147, 1151–1152. In each of these cases the bar of double jeopardy was denied the defendant because of having sought the mistrial. Indeed, we recognized the premise in McNeal v. Hollowell, 5 Cir., 1973, 481 F.2d 1145, 1150–1151, that a defendant who engages in a course of conduct calculated to necessitate the granting of a mistrial, although not actually requesting a mistrial, may be barred from relying on a double jeopardy defense.

The question for consideration then is whether the record makes out a case of judicial overreaching. The defendant was a third year law student who was charged with selling LSD. He was represented by retained counsel, Mr. Meldon, from the time of his arrest to trial, a period of a little over two months, and the representation was vigorous from the standpoint of efforts to discover and suppress. On the day of the trial Mr. Meldon was joined in the defense by Mr.

Baldwin, the law professor who handled this matter on appeal, and by Mr. Wagner, a Florida lawyer who resided in another district and who was not admitted to practice in the Northern District of Florida. Mr. Wagner stated to the court that he would handle the facts and that Mr. Baldwin would handle law questions and that the three appeared as co-counsel. The issue to be tried was a simple one: whether the jury would believe an undercover government agent who claimed that he purchased the LSD from the defendant. The defense was to discredit the informer by showing an effort by someone to extort money from the defendant after his arrest, presumably for dropping the prosecution.

While recognizing the possibility and even probability in some cases of different inferences being drawn by different readers of records, I draw the distinct conclusion from the record that Mr. Wagner conducted himself in an improper manner from almost the moment of his entry into the case. The trouble started in a preliminary hearing on a motion to suppress. There was impropriety on Wagner's part in the opening statement in the form of arguing, rather than stating the case and, with regard to the baseless charge of extortion against the government witnesses. The district court gained the impression that Mr. Wagner was baiting the court and I find ample support for that impression. At any rate, after Wagner was removed from the case and after the discussion between his remaining two lawyers and an overnight delay, one of his lawyers made the following representation to the court:

"Your Honor, I have conferred with the Defendant and he wishes to move for a mistrial at this time and after full consideration of the situation and an explanation of the alternatives before him, he feels that he would move for a mistrial and that this would be in his best interest."

Absent such a motion the district court could have gone forward with the trial. It may be, as is said in the ma-

---

1. Given the view of the majority that further prosecution is barred, I do not reach defendant's other assignments of error including whether the district court was in error at all in removing defendant's co-counsel from the case.

jority opinion, that the case would have been reversed because of error in removing Mr. Wagner but there would have been no double jeopardy bar. It would have been the defendant who sought the reversal based on the removal of Mr. Wagner. *Jorn, supra,* 400 U.S. at 484, 91 S.Ct. 547, 27 L.Ed.2d 556.

It may be, of course, as the majority points out that other methods of control short of removal were available to the court. It may be that another judge would have utilized other methods but the question is whether the method utilized in this instance reached the proportions of judicial overreaching. My answer is in the negative.

The sum of the majority opinion is to apply to this case the abuse of discretion test of *Jorn* where a mistrial was granted by the court sua sponte. This is simply an incorrect approach and confuses two separate tests. Here the defendant sought the mistrial and there is no factual basis for a finding of judicial overreaching as distinguished from error amounting to an abuse of discretion. The majority does not contend otherwise but simply fashions a new doctrine of double jeopardy: the bar is applicable on the basis of error amounting to an abuse of discretion on the part of the trial court despite appellant seeking the mistrial.[2] This is contrary to *Jorn.*

There are two unfortunate aspects to the majority opinion. First, the *ratio decidendi* is too extreme to be workable and will give rise to much reluctance in granting mistrials. The trial courts will understand that society will be better served by completing a trial, even after clear error has arisen and the defendant seeks the mistrial, than the alternative of a mistrial and the possible bar of double jeopardy based on the error. The time and expense involved in completing the trial, taking an appeal, and in the retrial, will often be a small price to pay to protect the societal interest in law enforcement.

Dinitz goes free but there should be little likelihood of a district court falling into a trap of the kind set here, whether set purposely or by happenstance, now

that the law elucidated in the majority opinion has surfaced. Hopefully, the majority decision will thus spend itself.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, RONEY and GEE, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc.

It is ordered that the cause shall be reheard by the Court en banc on briefs without oral argument. The Clerk shall set a briefing schedule for the filing of supplemental briefs.

2. A strong argument could be made for the proposition that Mr. Wagner pursued a course of conduct calculated to cause a mistrial. *Cf.* McNeal v. Hollowell, *supra.*