**UNITED STATES of America,
Appellee,**

v.

**Billy Delano WALDEN et al., Appellants.**

**Nos. 14974–14983.**

United States Court of Appeals,
Fourth Circuit.

Argued June 10, 1971.

Decided Sept. 22, 1971.

Frank K. Sloan, Charles Porter, Charles E. Baker, Robert E. Kneece, Kermit S. King, James L. Mann, II, Robert W. Dibble, Jr., Columbia, S. C. (B. H. Barton, Augusta, Ga., James C. Anders, Taylor B. Rion, Jr., and Glenn, Porter & Sullivan, Columbia, S. C., on the brief), for appellants in Nos. 14,974 thru 14,983.

Frank J. Kiernan, Jack L. Marshall, Wistar D. Stuckey, Michael A. Pulliam, Marvin L. Smith, Asst. U. S. Attys. (John K. Grisso, U. S. Atty., and Lionel S. Lofton, on the brief), for appellee.

Before BOREMAN, BRYAN and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

This is an appeal by ten of eleven [1a] defendants charged with substantive offenses and conspiracy to burglarize numerous banks in various Southeastern states. There have been two trials. The first was aborted by a mistrial declaration. The second resulted in jury verdicts of guilty. The appeals are based

---

[1a.] The eleventh defendant has not appealed. Since our decision with respect to the other defendants proceeds on constitutional grounds, the non-appealing defendant may obtain review of the validity of his conviction by filing a motion under 28 U.S. C.A. § 2255.

on various grounds including the claim that the first trial was unnecessarily aborted and the second trial constituted double jeopardy in violation of the Fifth Amendment. We agree, and reverse under United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971).

## I.

After returning from a lunch recess on the third day of the first trial, the trial judge said:

> Gentlemen, the United States Marshal has called to my attention that during the lunch hour, we sent the jury out, and then as they were taking the jury to lunch two of the jurors inadvertently remained in the Jury Room or in the rest room or rest rooms. I don't know all the details, but that is not necessary. When the Marshal discovered it and went back upstairs to get them, they were at the door; there were also at the door in the hallway in their presence the various defendants who at the time were in custody, and I assume some if not all of them were in handcuffs.

The judge referred to our decision in Holmes v. United States, 284 F.2d 716 (4th Cir. 1960),[1] as controlling under the circumstances and suggested that the defendants and their counsel consider a mistrial motion.

Counsel for the defendants made various requests to have the events surrounding the supposed prejudicial event clarified and also requested consideration of alternative curative measures. The court declined further investigation into the event and rejected other possible curative procedures.[2]

Despite the intimation that the rest of the jury had no actual knowledge of what had transpired, the suggestion by defense counsel Dibble that the two viewing jurors be removed replacing them with two alternates sitting with the jury

1. The following is a *precis* of *Holmes*:
   Despite the careful instruction they had received, one of the feminine members of the jury, during lunch immediately after submission of the case and just before the jurors commenced their deliberations, inquired of one of the deputy marshals in charge of the jury, or generally of those in her hearing, "I wonder where the defendants are staying?" To this the deputy marshal responded, in effect, that he did not know where Holmes was staying, but he knew that Bedami [the other defendant] was staying in the Lexington county jail serving a 6-year sentence. * * *
   It is clear that the deputy marshal improperly communicated information to members of the jury which, alone or in combination with newspaper articles they had read, informed them of the prior conviction.
   The judge would not have permitted reference in open court to such a conviction. * * *
   We think this improper communication by a court official to members of the jury required an order granting a new trial.
   Holmes v. United States, 284 F.2d 716, 718–719 (4th Cir. 1960).

2. MR. PORTER: Your Honor, could we have the names of the [two] jurors?
   THE COURT: I don't know the names.
   MR. GLENN: I don't know if the Marshal knows the name or not, but it would have a bearing on whether I would make such a motion.
       *     *     *     *     *
   MR. GLENN: What I am thinking about is whether or nor the rest of the jury has now had the knowledge that those two jurors have.
       *     *     *     *     *
   MR. GADDY: The only information, your Honor, that the rest of the jurors have is that the other two were left. *That is the only information they have.* (emphasis added)
       *     *     *     *     *
   MR. DIBBLE: Would there be a possibility if we had a conference * * * to confer with the two, or ask them questions?
   THE COURT: No. There is one thing that I don't do and that is have any talk with a juror. * * * Nobody should talk to a juror before, during, or after a trial about anything, and I don't ever do it unless it is of such gravity that I can't help it. * * *
   MR. DIBBLE: My only question is that we have two alternates. If we find they have said nothing, I thought we might have a possibility of taking them off.

was not accepted, and after a fifteen minute recess, counsel for four defendants—Ard, Walden, Damour and Hogan—formally moved for a mistrial. A mistrial as to all defendants was declared. Those who expressed their desire to proceed with the trial moved to sever. Basing his decision, it seems, on the contention by the government that separate trials would be "impractical," the court denied the motion.

Even after the judge announced this intention to abort, at least one of the counsel for the defendants continued to press the court to consider dismissing the two viewing jurors and continuing with the remaining twelve.[3] Moreover, counsel candidly advised the court that defendants' position at least as to the six who desired to proceed, was that a mistrial declaration would bar a subsequent trial under the double jeopardy clause.[4]

## II.

■■ Over 140 years ago, Mr. Justice Story in United States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824), formulated what has continued to be the standard in cases such as this one: that the double jeopardy clause of the Fifth Amendment prohibits a second trial after a first trial has been aborted without the defendant's consent, unless there was "manifest necessity" for doing so.

We think, that in all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances which would render it proper to interfere. To be sure, the power ought to be used with greatest caution, under urgent circumstances, and for very plain and obvious causes.

\* \* \*

22 U.S. (9 Wheat.) at 580, 6 L.Ed. 165.

Refusing to read the double jeopardy clause as an absolute bar to second trials, the "defendant's valued right to have his trial completed by a particular tribunal" is instead balanced against "the public's interest in fair trials designed to end in just judgments." Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949).[5] The mandate to trial judges under the Fifth Amendment is easy to state, but difficult

---

3. MR. KING: May I inquire of the court if your Honor has contemplated the substitution of the two alternates?
THE COURT: I considered every possibility. It would be difficult for me to make a determination that there has not been a contamination of the entire jury, if there has been a contamination by this particular confrontation which the United States Court of Appeals for the Fourth Circuit has said is not a harmless error.

4. MR. GLENN: Your Honor, I don't think I could serve the court without telling the court that the reason we have taken the position we have, I can't cite the court the case, but our understanding of the law is that when a conspiracy trial is in progress, and a mistrial occurs, and one of the defendants does not join in that motion for a mistrial, and the court doesn't grant it. I mean the court forced him into a mistrial, and he is then brought back to trial again, that that is double

jeopardy. I can't cite you the case, but that is my understanding.

5. Thus, reprosecution is not barred after a conviction is reversed on appeal, United States v. Ball, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896), or on collateral attack, United States v. Tateo, 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964). Mistrial declarations do not bar reprosecution when the jury is dismissed because they can not reach a verdict, Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892); United States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824); because of the disqualification of a juror, Thompson v. United States, 155 U.S. 271, 15 S.Ct. 73, 39 L.Ed. 146 (1894); Simmons v. United States, 142 U.S. 148, 12 S.Ct. 171, 35 L.Ed. 968 (1891); or because of tactical necessity in wartime, Wade v. Hunter, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949).

to apply: he must not "foreclose the defendant's option [to have his trial completed by a particular tribunal] until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." United States v. Jorn, 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971).

*Jorn* is apparently the penultimate if not the end product of a "trend toward reducing the occasions on which criminal defendants may be made to 'run the gantlet twice.'" Note, Double Jeopardy: The Reprosecution Problem, 77 Harv.L. Rev. 1272, 1272 (1964). Although the rubric remains the same, and the Court again declines, as it always has, to formulate rules based on categories of circumstances which will permit or preclude retrial, nevertheless, *Jorn* is, we think, a significant departure from prior controlling case law. We think it controls here and dictates a result we might not otherwise reach. Whether described in terms of "manifest necessity," *Perez, supra,* 22 U.S. (9 Wheat.) at 580, 6 L.Ed. 165, "imperious necessity," Downum v. United States, 372 U.S. 734, 736, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963); for "reasons deemed compelling by the trial judge," Gori v. United States, 367 U.S. 364, 368, 81 S.Ct. 1523, 1526, 6 L.Ed.2d 901 (1961); or "breakdown in judicial machinery," *id.* at 372, 81 S.Ct. 1523 (Douglas, J., dissenting), unquestionably the trial judge's "sound discretion" to abort a trial has been considerably narrowed.

This trial was commenced on March 23, 1970, and was aborted on March 26, 1970, and the second trial was conducted during May of 1970. Thus the district judge in aborting the first trial and denying the plea of double jeopardy entered at the second trial acted in light of Gori v. United States, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961); Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963); and United States v. Tateo, 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964); and without benefit of *Jorn* which was

not decided until January 25, 1971. But for *Jorn,* as we have said, we would be inclined to affirm for it is clear to us that the district judge acted out of zealous solicitude for the protection of the rights of the defendants and without the slightest intention to harrass or oppress them. As recently as 1968 we noted that the discretion of the trial judge to abort a trial "is undoubtedly being narrowed, as a practical matter, by awareness of the closer scrutiny to which the exercise of his discretion is now subjected." United States v. Smith, 390 F.2d 420, 423 (4th Cir. 1968). But even then we interpreted *Gori* and *Tateo* to insulate second prosecutions from attack where the first one had been aborted by the trial judge as a matter of fairness to the defendant—even an overly solicitous fairness. Doubtless the district judge here was led by *Gori, Tateo* and our interpretation of them in *Smith* to reasonably believe that so long as he acted out of concern for the best interest of the defendants, and there is no doubt he was genuinely concerned, his abortion of the trial would not constitute an abuse of discretion.

We think that *Jorn* all but eliminates trial judge motivation as an element to be considered in determining whether an aborted trial bars reprosecution. "Reprosecution after a mistrial has unnecessarily been declared by the trial court obviously subjects the defendant to the same personal strain and insecurity regardless of the motivation underlying the trial judge's action." 400 U.S. at 483, 91 S.Ct. at 556. In again expressly declining to formulate "bright line rules," the Court said that such rules "based on either the source of the problem or the intended beneficiary of the ruling would only disserve the vital competing interests of the Government and the defendant." 400 U.S. at 486, 91 S.Ct. at 557.

■ In light of *Jorn,* we hold with respect to the six defendants who did not move for a mistrial that the double jeopardy clause of the Fifth Amend-

ment barred the second trial, and they are entitled to judgment of acquittal.

The decision to abort was based upon a reading of our decision in Holmes v. United States, 284 F.2d 716 (4th Cir. 1960). There we reversed the conviction of two defendants because the jury had been inadvertently informed by a court official of one defendant's past criminal record, information which could not be introduced at trial.[6] Disqualification of a juror has always been viewed as an occurrence in which there is manifest necessity in declaring a mistrial. *See, e. g.,* Thompson v. United States, 155 U.S. 271, 15 S.Ct. 73, 39 L.Ed. 146 (1894); Simmons v. United States, 142 U.S. 148, 12 S.Ct. 171, 35 L.Ed. 968 (1891).

The district judge reasoned that the sight of one or more defendants in handcuffs at a recess would inevitably suggest to the viewing jurors that such a defendant was imprisoned under commitment for some prior crime. Such a misinterpretation of the incident is, of course, possible. But it seems as least equally probable that the witnessing jurors correctly understood the event, and were neither shocked nor surprised nor prejudiced by observing that persons charged with serious crimes are sometimes confined during trial and secured by handcuffs on their way to and from the courtroom rather than left free to come and go as they please. Unfortunately the record does not disclose the impact upon the two jurors. Again out of a sense of scrupulous fairness to defendants the trial judge refused to permit them to be interrogated despite a request that he do so. *Jorn* put upon him a duty to exhaust all other reasonable possibilities before deciding to foreclose defendants' option to proceed. The trial judge must make a "scrupulous exercise of judicial discretion." *Jorn* at 485, 91 S.Ct. 547. The scrupulous exercise of that discretion means that he must seek out and consider all avenues of cure to avoid trial abortion. There

was no such "scrupulous" exercise here. One cure, continuing the trial with the twelve remaining jurors, or even an agreement to proceed with fewer than twelve, was not considered in depth, despite defense counsels' suggestions to pursue that course. No effort was made to ascertain whether the other jurors knew of the event, not even by inquiry of the two who might have been tainted. "[T]he power [to abort] ought to be used with greatest caution, under urgent circumstances, and for very plain and obvious causes. * * *" *Perez, supra,* 22 U.S. (9 Wheat.) at 580, 6 L.Ed. 165.

The much harder problem is what to do about the four appealing defendants who did join in the motion to the district court for a mistrial. It "is ordinarily assumed" that a motion by the defendant for mistrial removes any barrier to reprosecution. *Jorn, supra,* 400 U.S. at 485, 91 S.Ct. 547; Green v. United States, 355 U.S. 184, 189, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). If the abortive procedure below had been initiated by these four defendants, we would have no doubt about it, for it would be nonsense to allow a defendant to actively seek a mistrial and by so doing thereafter prevent any trial at all. But here the trial judge, albeit with the best of motivation, invited the motions. Indeed the tenor of the colloquy between the court and counsel suggests the possibility that the district judge might have acted *sua sponte* had there been no response to his invitation, although it appears he would have accepted an unequivocal waiver of all defendants. Apparently convinced that the trial was inextricably flawed, he not unreasonably concluded that to proceed would be an exercise in futility, with inevitable appeal and inevitable retrial. But the possibility of the award of a new trial by an appellate court and the declaration of a mistrial by a trial judge are not substantial equivalents.

[3] "More satisfactory than the limitation of manifest necessity to 'breakdown[s] in judicial machinery' may be

---

6. *See* note 1, *supra.*

an interpretation couched in terms of whether a verdict sustainable on appeal could have been obtained had the trial judge not terminated the proceeding when he did. If the answer is yes, reprosecution ought to be barred unless the accused himself *solicited* a mistrial." Note, Double Jeopardy: The Reprosecution Problem, 77 Harv.L.Rev. 1272, 1281 (1964) (emphasis added). We think it comes to this: a reasonable apprehension that a trial is flawed sufficiently to result in reversal and retrial is not itself sufficient "manifest necessity" to justify trial abortion.

"Should the defendant decline to waive his right not to 'run the gantlet' twice rather than impose a mistrial and thereby immunize the defendant against further prosecution the judge may prefer to let the trial run its probably reversible conclusion." *Id.* at 1279.

Whether there was "consent" to the declaration of a mistrial involves varying and entirely different fact considerations. We think the time has come to inquire into such circumstances and to reject a flat rule that mere mouthing of the motion in open court constitutes in every case waiver of a subsequent plea in bar. It is easy to adhere to the established rule in a context where the accused himself clearly and unequivocally solicits a mistrial. He should not be advantaged by his own genuine wish to forego his option to proceed to a conclusion with the first tribunal. We also reject the opposite extreme that an appellate court might entirely disregard "consent" and thus force the trial judge to face squarely the question of whether the trial ought to continue. *Id.* at 1280.

Instead we adopt the middle ground of inquiring into the circumstances surrounding the formal entry of the motion. Certainly if a judge uses his authority to intimidate the accused into consenting (something which did not occur here) there is no real waiver. *Compare* United States v. Tateo, 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964). But short of such judicial overreaching, it seems

to us that when a motion for mistrial is invited by the court with intimation that the perceived error is fatal according to a decision called to counsels' attention by the court, and when little time has been granted to consider whether such a motion should be made, the result of freedom for some and imprisonment for others should not depend simply upon which of multiple defendants made the motion. If that is the law then we invite coin-flipping to decide who strikes out to get a man on first. Here we think the suggestion to counsel to make the motion, coupled with refusal to adequately consider other possible cures and the nature of the relatively trivial incident that triggered the abortion, destroyed any real option on the part of the defendants. It is not necessary to characterize it as "judicial overreaching." *Jorn, supra,* 400 U.S. at 485, 91 S.Ct. 547. The manifest necessity doctrine as restated in *Jorn* demands a thorough inquisition by the trial judge into all the facts and painstaking consideration of all possible cures short of trial abortion.

We do not confuse actual consent to a mistrial motion that bars the defense of double jeopardy, and " 'voluntariness' for purposes of assessing the validity of a plea of guilty." United States v. Jorn, 400 U.S. 470, 484–85 n. 11, 91 S.Ct. at 557 (1971). *See* United States v. Tateo, 377 U.S. 463, 467, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964). The crucial difference between the two is the source from which the ultimate decision must spring. The ultimate authority at trial to abort rests with the trial judge. While a guilty plea need only be accepted, a mistrial motion must be granted. A motion for mistrial is assumed to work in favor of the defendant by opening an opportunity for another trial, while a plea of guilty obviously works to his detriment by ending matters against him altogether. Even though the degree of "voluntariness" for making a mistrial motion that extinguishes the defense of double jeopardy may therefore properly fall short of that required to make a

guilty plea, it cannot be diminished unnecessarily by the final granting authority, either by pressing solicitation or by blocking other possible methods of cure so that the defendant is put to an incomplete or uninformed choice. The protection of the Fifth Amendment is not so easily avoided.

■ The decision not to probe other possible cures and not to further investigate the facts marked the point, we think, at which the mistrial was effectively declared despite the ceremonial motions made by four defendants after the fifteen minute recess. Since there was no manifest necessity for terminating the first trial, it follows that for subsequent violations of the double jeopardy clause of the Fifth Amendment the convictions must be

Reversed.