**UNITED STATES, Appellant,**

v.

**Paul J. HARVEY, Appellee.**

**No. 10843.**

District of Columbia Court of Appeals.

Argued Feb. 17, 1977.

Decided Aug. 29, 1977.

Opinions Vacated on Grant of Rehearing en Banc Nov. 23, 1977.

---

William J. O'Malley, Jr., Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty. and John A. Terry and Albert H. Turkus, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellant.

Thomas W. Farquhar, Washington, D. C., appointed by the court, for appellee.

Before NEBEKER and HARRIS, Associate Judges, and PAIR, Associate Judge, Retired.

HARRIS, Associate Judge:

The government appeals from the trial court's order dismissing an indictment for first-degree burglary, D.C.Code 1973, § 22–1801(a), and petit larceny, *id.* § 22–2202. We have jurisdiction to hear the appeal under § 23–104(c) of the Code unless the Double Jeopardy Clause of the Fifth Amendment erects a constitutional barrier. We conclude that it does not, and reverse.

I

The problem began in another Superior Court case brought against a father and his son in *United States v. Jamison*, Cr. Nos. 80315 and 80316–'74, aff'd, D.C.App., 373 A.2d 594 (1977). Earlier convictions of the two men in the United States District Court for first-degree murder had been reversed by the circuit court on the ground that the indictments were constitutionally infirm. *United States v. Jamison*, 164 U.S.App.D.C. 300, 505 F.2d 407 (1974). Clayborne Jami-

son, Sr., and Clayborne Jamison, Jr., then were reindicted in the Superior Court and tried for second-degree murder. The jury acquitted the father and convicted the son. After the verdict was returned, Judge Hannon spoke to the jurors:

Now, ladies and gentlemen of the jury, you wondered what happened in this case since 1971, and I can tell you this time now that your verdicts are in, and I want to attest upon you that in no sense of the word, am I being critical of you. I am merely telling you what the history of this case was.

Mr. Jamison, Jr., and Mr. Jamison, Sr., were tried in this case at another time, in another court before another judge, at which time they were both found guilty of murder in the first degree. Because of a technicality, the Court of Appeals reversed that, and they had to be tried before you, and you found Jamison, Jr., guilty of what the Court of Appeals said must be a lesser offense, so the Court of Appeals directed that he be tried only for second degree, and so it came back before you, and you did find Jamison, Jr., guilty of second degree, and his father not guilty of murder in the second degree.

Again, I want to impress upon you that what I am telling you, this is the history of the case, and in no sense am I being critical of the judgments you made in this case. I just want to inform you of the history of this case.

I want to thank you on behalf of counsel and myself for the attention that you have provided in this case, and I excuse you now to return to the jury lounge for your next case. Thank you very much.

As the jurors left the courtroom, several overheard a police officer remark that the jurors had let the wrong man go. Shortly thereafter, the same officer asked one juror if the jury had a problem with the government's case.[1] Some other jurors learned of

---

1. Our dissenting Brother has elected to magnify beyond all proportion—and indeed beyond the record—the incidents with which we are dealing. Illustratively, the dissent (at p. 417) char-

acterizes the conversation to which we have just referred as follows:

This same police officer confronted one of the *Jamison* case jurors outside the court-

these events. These incidents came to Judge Hannon's attention, and he had the jurors return to his courtroom. He addressed them in part as follows:

> I was in no way critical of the verdict that you returned in this case with respect to Mr. Jamison, Sr., and I want to impress that upon you right now, that whether or not I disagree with that verdict is something that you will never know, because I will never say anything that would cause one of you to conclude that I disagree with that verdict, because, if I did so, then I would be in effect intimidating you in connection with carrying out your duties in the next case.

> You are not to be intimidated by any Judge or police officer. If you are intimidated by what the police officer said to you, and I assume that he said it to you. If you feel that by virtue of what was said to you, that you cannot be a fair and impartial juror for the rest of the month, then please tell me now, and I will excuse you right now, but you should not be intimidated in carrying out your responsibilities as jurors by anything that was said to you, and I hope, and I want to make that plain to each and every one of you, so that each of you understands that.

A brief general voir dire persuaded Judge Hannon that all the jurors could be fair and impartial in future cases, and he instructed them to return to the jury lounge.

Later the jury panel in appellee's case came to the courtroom and was sworn for the voir dire. Judge Alexander, appellee's trial judge, inquired:

> Is there anyone who has had, what shall I say, a bad taste left in his or her mouth by a prosecutor during the course of this month? All right. We will take these answers at the bench.

> Or a defense lawyer? Or a judge?

> Anyone been castigated by a prosecutor or a defense lawyer or a Judge?

> All right. Those of you who fall into that category we will take those at the bench.

> \*   \*   \*   \*   \*   \*

> Before we take those at the bench, let me remind you that prosecutors, lawyers and Judges are human and they make mistakes, just like anybody else, and if you have had an incident to occur which affects you with respect to either one of those categories, it may be that it can affect you in another case. It may be that if I had remonstrated with you because you returned a guilty verdict, then you may not like that. You have a right not to like it.

---

house several minutes later and demanded to know why the jury had refused to convict the acquitted co-defendant.

The juror's actual testimony was as follows:
> He walked to me [as the jurors were leaving the courtroom] and he says, "What was the hangup?" So, I turned around and I said, "You mean about"—whatever his name is—I said, "They couldn't reach"—"They said they didn't have enough evidence," that's what I said. He said, "What was the hangup," and I said, "They said they didn't have enough evidence."

> So, then, we was still going out the door together and he said, "not enough"—I think he said, "Not enough evidence." I think he said the father was the one—he did. He said to me, "The father gave the son the gun to shoot the man—the fellow with," and then he walked on and when we . . . got over to the court, then I saw some of the girls [other jurors] and I was telling them what he said.

The dissent next states: "The juror was shaken and upset by the exchange. . . ." However, her testimony reveals the opposite:
> THE COURT: Now, you didn't get upset right away because you didn't know the policeman was wrong to do this?

> THE WITNESS: No, I didn't get—it didn't bother me at all. The only thing that bothered me was the guilt.

> \*   \*   \*   \*   \*   \*

> THE COURT: It wasn't him? You weren't upset at him?

> THE WITNESS, Oh, no, not at him.

> THE COURT: Were you angry at him?

> THE WITNESS: No, I wasn't angry at him.

The hearings on what happened concerning the Jamisons' jury were rather freewheeling in nature, and resulted in a total of 687 pages of transcript. The juror made clear her belief (and that of a number of other jurors) in the acquitted defendant's guilt. It was solely in that context that she stated that she felt "terrible" because "I shouldn't have changed my decision. . . ."

If I have remonstrated with you because you returned a not guilty verdict, you may not like that, and you have a right not to like it.

If I remonstrated with you for anything, you may not like it, and you may be proper, but what I'm trying to say is, don't have any fear in this courtroom or any other courtroom because you have a very important responsibility and people like me ought not frighten you and people like me ought not make you afraid to do what your conscience dictates.

Your job will be to hear the evidence. It will be to determine credibility. It will be to apply that, the facts that you will find to the law as the Court instructs you. No one should make you afraid to do any of those duties, neither the whole country, nor me, nor the prosecution, nor the defense.

No one should frighten you nor should you be allowed to have yourselves frightened.

So, if you have any fear engendered by anyone or anybody, when you come to the bench, you can tell us about that, too.

One venirewoman did approach the bench, but not about the Jamison incidents. Later, Judge Alexander asked:

Now, ladies and gentlemen of the panel, having heard the subject matters and questions propounded and some answers given, may have given you some ideas about what you would like to do and whether or not you would like to be excused.

Any person on the panel who would not like to sit in this particular case other than indications that the Court has already given?

Are there any members of the panel who feel that he or she could not render a true and impartial verdict based solely upon the testimony adduced from the witness stand, the logical inferences to be drawn therefrom and according to the Court's instructions?

There being no response, twelve jurors and one alternate were selected, and the court again asked if anyone felt unable to give an impartial verdict. Throughout all of these proceedings, no juror mentioned Judge Hannon's remarks or the police officer's comment and question at the conclusion of the Jamisons' trial. The jury then was sworn.

The following morning, a defense lawyer in another case moved for a continuance based upon the Jamison incidents. Upon learning of this, Judge Alexander decided to obtain transcripts of the earlier events and hold hearings to determine if his jury, which included one Jamison juror, had been prejudiced. Appellee's counsel moved to dismiss the indictment on that ground. Toward the end of the lengthy hearings, the jury was discharged without ever having heard any evidence. Their period of jury service was over, and they returned to their normal pursuits. Approximately six months later, Judge Alexander issued a written opinion dismissing the indictment.[2] The government appealed.

## II

Double jeopardy principles do not preclude this appeal.[3] Ordinarily, a government appeal after jeopardy has attached is barred if "further proceedings of some sort, devoted to the resolution of factual issues going to the elements of the offense charged, would [be] required upon reversal and remand." *United States v. Jenkins*, 420 U.S. 358, 370, 95 S.Ct. 1006, 1013, 43 L.Ed.2d 250 (1975); *see Finch v. United*

2. In the final paragraph of its 40-page opinion, the court concluded

that police and prosecutorial misconduct deprived Mr. Harvey, the accused, of his Sixth Amendment rights to a fair and impartial jury of his peers, as well as to the effective assistance of counsel. As such, Mr. Harvey was denied due process of law guaranteed by the Fifth Amendment to the Constitution.

The unfortunate but heinous circumstances detailed at the outset of this Opinion dictate that the Indictment be dismissed.

3. Of course, jeopardy attached when the jury was sworn. *Sarfass v. United States*, 420 U.S. 377, 388, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975); *Illinois v. Somerville*, 410 U.S. 458, 467, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973).

*States,* —— U.S. ——, 97 S.Ct. 2909, 53 L.Ed.2d 1048 (U.S.1977). It is well settled, however, that a mistrial which has been sought by a defendant does not bar retrial. *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). The objectives of the double jeopardy bar would not be thwarted by allowing a government appeal when a defendant is in any event subject to a new trial.

When the trial judge decided to take the motion for dismissal of the indictment under advisement, he excused the jurors.[4] This he did with defense counsel's consent, although counsel sought to shy away from acknowledging it. Counsel stated:

> I don't mean to appear on the record as making a motion that the jury be discharged because, of course, that would reflect on later claims we would have in this case. It seems to me they could be excused.
>
> \* \* \* \* \* \*
>
> Your Honor, so far as—Well, on this particular issue pending before the Court, I understood your ruling yesterday [that the jury would be discharged or excused] as it is today. So that's why I said briefly that I had no objection yesterday to the jury being released. I hate to use the word dismissed, discharged, or anything like that so long as [the prosecutor] wants me to make a motion for a mistrial.

Such semantic quibbling may not control our interpretation of the realities of the situation.[5] Surely the discharge of a jury before it reaches a verdict (or, as here, before it even hears opening statements) constitutes a mistrial. *Fisk v. Henarie,* 32 F. 417, 427 (C.C.D.Or.1887); *State ex rel. Sullivan v. Peterson,* 64 Ariz. 40, 165 P.2d 309, 312 (1946); *State v. Johnson,* 248 S.C. 153, 149 S.E.2d 348, 350–51 (1966). The

trial court's action "was functionally indistinguishable from a declaration of mistrial." *Lee v. United States,* —— U.S. ——, 97 S.Ct. 2141, 2146, 53 L.Ed.2d 80 (1977) (footnote omitted). Because the trial was aborted under circumstances permitting retrial, the government properly could appeal from the subsequent dismissal of the indictment under D.C.Code 1973, § 23–104(c).

■ Nonetheless, even assuming arguendo that the trial court was correct in concluding that the jury had been prejudiced,[6] it went too far in dismissing the indictment. The proper remedy for a trial before a presumably tainted jury is a new trial before an impartial one. *See generally Sheppard v. Maxwell,* 384 U.S. 333, 363, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Irvin v. Doud,* 366 U.S. 717, 728, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Under the assumption that the jury was tainted (an argument which was made by appellee's counsel both at trial and before us), the correct relief would have been the granting of a mistrial. *E. g., Simmons v. United States,* 142 U.S. 148, 154–55, 12 S.Ct. 171, 35 L.Ed. 968 (1891); *Parker v. United States,* 507 F.2d 587, 588 (8th Cir. 1974), *cert. denied,* 421 U.S. 916, 95 S.Ct. 1576, 43 L.Ed.2d 782 (1975); *United States v. Chase,* 372 F.2d 453, 464–65 (4th Cir.), *cert. denied,* 387 U.S. 907, 87 S.Ct. 1688, 18 L.Ed.2d 626 (1967); *United States ex rel. Peetros v. Rundle,* 342 F.Supp. 55, 60 (E.D.Pa.1972), *aff'd mem.,* 478 F.2d 1399 (3d Cir. 1973); *see Whitfield v. Warden,* 486 F.2d 1118, 1122–23 (4th Cir. 1973), *cert. denied,* 419 U.S. 876, 95 S.Ct. 139, 42 L.Ed.2d 116 (1974).

■■ The rule that a mistrial granted at the defendant's request does not bar retrial has an appropriate exception for bad faith prosecutorial or judicial conduct which is designed to give a more favorable opportu-

---

**4.** Our dissenting Brother strives to minimize the significance of the discharging of the jury, but the fact that it was discharged is incontestable.

**5.** The Supreme Court has rejected fine distinctions in determining whether trial-aborting events are mistrials. *Lee v. United States,* —— U.S. ——, 97 S.Ct. 2141, 2146 & n.9, 53 L.Ed.2d

80 (1977); *cf. United States v. Martin Linen Supply Co.,* 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642, 1354–55 (1977) (rejecting the use of mere labels in determining if a court's ruling were an acquittal).

**6.** *But cf. Grady v. United States,* D.C.App., 376 A.2d 437 (No. 9359, 1977).

nity for conviction. *Lee v. United States, supra,* —— U.S. at ——, 97 S.Ct. at 2147–48; *United States v. Dinitz, supra,* 424 U.S. at 611, 96 S.Ct. 1075; *see, e. g., United States v. Kessler,* 530 F.2d 1246, *rehearing en banc denied,* 535 F.2d 660 (5th Cir. 1976) (knowing misrepresentation of physical evidence); *cf. Downum v. United States,* 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963) (mistrial granted due to absence of prosecution witness was improper and barred retrial). However, there is no rational basis on this record for saying that either Judge Hannon (in the Jamisons' case, which is once removed from this case) or the Assistant United States Attorney in this case was guilty of misconduct.[7] *Cf. Lee v. United States, supra,* —— U.S. at ——, 97 S.Ct. at 2148. Once Judge Hannon was aware of a potential problem as an aftermath of the Jamisons' case, he took prompt curative measures with respect to those jurors. *Cf. Grady v. United States,* D.C.App., 376 A.2d 437 (No. 9859, 1977). The prosecutor in this case understandably believed that Judge Alexander's extensive voir dire would have cured any possible prejudice which might have resulted from events concerning which he had only second-hand information. *Cf. Kyle v. United States,* 152 U.S.App.D.C. 141, 144–45, 469 F.2d 547, 550–51 (1972), *cert. denied,* 409 U.S. 1117, 93 S.Ct. 920, 34 L.Ed.2d 700 (1973).

Being satisfied that a new trial is constitutionally permissible, we need not inquire further into the basis for the trial court's decision to dismiss the indictment.[8] Because appellant will be tried before a new jury, the question of whether his first jury properly was considered to be prejudiced by its inclusion of one of the jurors from the Jamisons' case is moot.

Reversed and remanded with instructions to reinstate the indictment.

PAIR, Associate Judge, Retired, dissenting:

In my view, neither the majority's analysis nor its disposition in this case can be reconciled with the constitutional guarantee that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb."[1] Since the questions presented are of constitutional dimensions and since the majority opinion fails to adequately address them in the context of the record, I begin by recounting the facts and sequence of events that led up to this appeal.

The appellee (Harvey) was charged in an indictment with first-degree burglary, D.C. Code 1973, § 22–1801(a), and petit larceny, D.C.Code 1973, § 22–2202.

Prior to the commencement of Harvey's trial, the trial of a factually unrelated case, *United States v. Jamison,* Super.Ct. No. 80316–74, was concluded when the jury re-

---

7. To the extent that it could be said that any "misconduct" occurred, it was committed by the police officer who was baffled by the acquittal of the senior Jamison in that case. That, however, not only did not constitute "prosecutorial" misconduct (since a police witness is not a prosecutor), but it occurred post-trial in another proceeding. (As to the propriety of a lawyer's communicating with jurors, *see* DR 7–108 of the Code of Professional Responsibility.)

8. The dissent's heavy reliance upon *United States v. Means,* 513 F.2d 1329 (8th Cir. 1975), is misplaced. There, following a jury trial of approximately 8½ months in length, the trial judge concluded that the government had been guilty of multiple acts of prosecutorial misconduct in that particular trial. At the time of the court's ruling, there still was an existing jury, but the court elected to dismiss the indictments

rather than declare a mistrial. The court of appeals considered itself to be dealing with a case of first impression in *Means,* and concluded that the dismissals were nonappealable. The overall factual situation before us bears no recognizable similarity to that presented in *Means.* (Appellee's able counsel did not even cite *Means,* although that case was decided 19 months prior to the filing of appellee's brief and 23 months prior to the filing of appellee's post-argument "Supplemental Memorandum on This Court's Jurisdiction To Hear This Appeal.") Here, *inter alia,* not even opening statements were given; the jury simply was sworn and later was discharged months before the indictment was dismissed. Also, as we have noted, there is not even a hint of true prosecutorial misconduct in this case.

1. U.S.Const. amend. V.

turned verdicts convicting one defendant and acquitting a co-defendant. As the foreman of the jury read the verdicts, there were audible expressions of disapproval by the members of the Metropolitan Police force who had testified for the government in the *Jamison* case.

The trial judge in *Jamison,* who was not the trial judge in the *Harvey* case, then explained to the jury that at a previous trial both defendants had been convicted, but that the convictions had been reversed on "a technicality."[2] The *Jamison* judge explained further that the fact was being brought to their attention only to explain why the indictments in that case were so old,[3] and not as a reflection on the jury's verdict acquitting one of the co-defendants. Nevertheless, some of the jurors were upset and the *Jamison* trial judge eventually called the jury back to explain a second time that they were not being chastised.

In the interim and after leaving the courtroom, several of the jurors heard a detective sergeant of the Metropolitan Police Department declare loudly that the jury had convicted the wrong man. This same police officer confronted one of the *Jamison* case jurors outside the courthouse several minutes later and demanded to know why the jury had refused to convict the acquitted co-defendant. The juror was shaken and upset by the exchange and reported the incident to other potential jurors who were waiting for their next assignment. A general discussion ensued after which the incident was reported to a Superior Court official in charge of jurors.

During the process of jury selection in the *Harvey* case, neither Judge Alexander (the trial judge) nor defense counsel was informed of the incidents recounted above. It was later conceded that the Assistant United States Attorney assigned to represent the government in the *Harvey* case knew of the post-verdict *Jamison* situation and knew also that one of the *Jamison* jurors was a potential juror in the *Harvey* case and was, in fact, sworn as a juror

without objection. This information was not brought to the attention of either the trial court or defense counsel. After the exercise of peremptory challenges and challenges for cause by both sides, the *Harvey* trial judge conducted a voir dire of the jury from the bench during which there was the colloquy quoted at pages 413–414 of the majority opinion.

The jury, containing the one member of the *Jamison* jury and at least two other jurors who had heard about the post-verdict episode, was then impanelled and sworn.

It was on the following day, July 30, 1975, that the possibility that the jury was contaminated was first brought to the attention of the *Harvey* trial judge and defense counsel. The court decided sua sponte that a voir dire examination of the *Harvey* jurors was necessary to determine the extent of any contamination. After lengthy and exhaustive examination of the jurors by the trial court, defense counsel on August 23, 1975, moved to dismiss the indictment.

It is clear to me from the record before us that the motion to dismiss the indictment was not intended by defense counsel as a waiver of appellee's Fifth Amendment rights against twice being placed in jeopardy for the same offense. Defense counsel repeatedly pointed out that, in his opinion, should the motion be granted, retrial would be precluded. In his "Points and Authorities" in support of the motion, counsel stated:

> The United States, undoubtedly, will contend that such a remedy is punitive, for the dismissal of the indictment undoubtedly will preclude further litigation in this case. Counsel would respectfully submit that the law would allow such a punitive remedy.

Defense counsel also urged vehemently that a mistrial would not be a proper remedy in the case because:

---

2. *See United States v. Jamison,* 164 U.S.App. D.C. 300, 505 F.2d 407 (1975).

3. The indictments were dated 1971. The second trial in *Jamison* concluded in July 1975.

In determining the remedy the Court must consider the seriousness of the misconduct alleged and the necessity of placing government officials on notice that such misconduct will not be tolerated. If the Court merely declares a mistrial, there is no effective deterrent against similar conduct in future cases . . .

To declare a mistrial at this late date would be tantamount to shifting the responsibility for these unfortunate events to the accused. He will bear the burden of raising the issue of jeopardy in another trial although the record shows that none of the blame is attributable to him.

It should also be noted that the government fully appreciated the potential impact of the motion to dismiss the indictment for, in its strenuous opposition to the motion, counsel for the government argued that "[t]he appropriate remedy, should the Court conclude that some remedial action is necessary, would be for the Court to declare a mistrial."

Upon consideration of the motion and the opposition thereto, the trial court decided to discharge the jury concluding that, of the two alternatives the court then felt were open to it—either granting appellee's motion to dismiss the indictment or declaring a mistrial sua sponte—neither would require the continued presence of the jury then impanelled.[4] The jury was then discharged, and on September 2, 1975, the matter was taken under advisement by the trial court.

On March 3, 1976, the trial court issued a lengthy memorandum opinion granting appellee's motion to dismiss the indictment, ruling that the post-verdict events in the *Jamison* case resulted in the contamination of the *Harvey* jury. The court said that this taint occurred as a direct result of the prosecutor's failure to inform the court of his knowledge of the post-verdict events in the *Jamison* case prior to the impanelling of the jury.[5] The court concluded that as a result of this, the defendant was denied his right to effectively challenge, either on peremptory grounds or for cause, potential jurors who the government knew to be contaminated. The trial court also held that governmental misconduct denied the trial court access to a government memorandum pertaining to the *Jamison* matter. The

---

**4.** The trial judge, conferring with counsel for both sides, said at p. 600 of the record:

At this stage prior to a conclusive ruling it does not appear that this case will be allowed to continue with this jury and I say that in all candor to you, gentlemen, and I ask you, that being the situation shall we continue to have the jury return tomorrow?

By the next day, as reflected at p. 655 of the transcript, Judge Alexander had decided that the case would either be terminated by granting the motion to dismiss or by a sua sponte declaration of a mistrial, and that neither remedy necessitated the continued presence of the jury then impanelled.

The Court made the suggestion yesterday that there are only two alternatives in the case.

One is not to proceed with this trial. The two alternatives are to either grant the motion made, that is, to dismiss the indictment; or, two, declare a mistrial. Both sides have argued the issues very strongly, cogently, and on the basis of what the Court has just announced or reiterated the case will be decided on either of those two issues and the Court will not issue that opinion today.

**5.** Ethical Consideration 7–13 of the Code of Professional Responsibility as amended by the District of Columbia Court of Appeals provides as follows:

The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict. This special duty exists because: (1) the prosecutor represents the sovereign and therefore should use restraint in the discretionary exercise of governmental powers, such as in the selection of cases to prosecute; (2) during trial the prosecutor is not only an advocate but he also may make decisions normally made by an individual client, and those affecting the public interest should be fair to all; and (3) in our system of criminal justice the accused is to be given the benefit of all reasonable doubts. With respect to evidence and witnesses, the prosecutor has responsibilities different from those of a lawyer in private practice: the prosecutor should make timely disclosure to the defense of available evidence, known to him, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment. Further a prosecutor should not intentionally avoid pursuit of evidence merely because he believes it will damage the prosecutor's case or aid the accused.

combined effect of all of this, said the court, was to deprive appellee "of his Sixth Amendment right, to a fair, impartial and uncontaminated jury of his peers, as well as effective assistance of counsel."

The court said also that:

The true extent of the infection we will probably never know; but one poisoned juror alone is sufficient to contaminate an entire jury. Here, instead of one, we have three.

Having determined that the jury was contaminated, the trial court considered whether the proper remedy was a sua sponte declaration of a mistrial or the granting of appellee's motion to dismiss, saying:

Under these circumstances, of the two available remedies, mistrial and dismissal of the Indictment, justice cries out for the latter. It is the only remedy which would not shift the burden and brunt of this governmental overreaching to the accused. This is so because the former remedy contemplates reprosecution of an accused, *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1970); and it is to be declared only where dictated by "manifest necessity" or where the ends of public justice requires. *United States v. Perez*, 9 Wheat. 579, 6 Ed. 165 (1824). [*Sic*]

There can be no doubt that upon this record, the Court could grant a mistrial *sua sponte*. But that is not Mr. Harvey's motion. Moreover, if the "manifest necessity" was created by governmental overreaching or misconduct, the recent trend of authority militates against the remedy sought by the government. *United States v. Dinitz*, 492 F.2d 53 (5th Cir. 1974), *cert. granted*, 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975);[6] *United States v. Walden*, 448 F.2d 925 (4th Cir. 1971). This Court cannot in good conscience, allow the government to reap the benefits of its own wrongdoing and saddle Mr. Harvey with the burden of its misconduct.

The Court's determination to dismiss the Indictment is not taken lightly, for it is necessary that the laws be enforced swiftly and surely, in order that the rights of public justice be preserved. Just as essential, however, is that the laws not only be enforced fairly, but bear the appearance of fair and equal enforcement. Convictions cannot be brought about by methods that offend the "essence of justice." *Rochin v. California*, 342 U.S. 165 (1952). Nor can this Court tolerate fast and loose play with the administration of justice. *United States v. Dinitz, supra*. The totality of the circumstances evident here indicate that Mr. Harvey was denied his ancient right to a trial by a fair and impartial jury.

. . . . .

[T]he totality of circumstances here require stronger measures consistent with supervisory powers exercised by Federal Courts, and allowed by D.C. Superior Court (Crim.) R. 12. Hence, dismissal of the Indictment is hereby ordered.

This appeal by the government followed.

The majority opinion begins with a concession that jeopardy attached when the jury was sworn, but insists nevertheless and notwithstanding the doctrine of *United States v. Jenkins*, 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975), that double jeopardy principles are not a bar to this appeal. As support for this conclusion, it is said on the authority of *United States v. Dinitz*, 426 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), that ". . . a mistrial which has been sought by a defendant does not bar retrial." The difficulty with this is that the defendant (appellee) in the case at bar did not ask for a mistrial, rather he asked for a dismissal of the indictment.

What is crystal clear from the record is that the trial judge, when confronted with what he believed to be prosecutorial overreaching, chose to dismiss the indictment rather than declare a mistrial sua sponte so that appellee could *not* be prosecuted by the government.

---

**6.** *Dinitz* involved the granting of a defendant's motion for a mistrial. After the trial court's opinion in the instant case, the Supreme Court

reversed *Dinitz* on standard mistrial grounds. *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976).

Strangely enough, the majority is apparently of the view that the only action the trial court could have legally taken was the sua sponte declaration of a mistrial. I do not understand that conclusion to be compelled by any of the cases the majority cites in support of the proposition. *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), and *Irvin v. Doud*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), both involved the granting of new trials on motions for post-conviction relief. In *Parker v. United States*, 507 F.2d 587 (8th Cir. 1974), *cert. denied*, 421 U.S. 916, 95 S.Ct. 1576, 43 L.Ed.2d 782 (1975), and *Whitfield v. Warden*, 486 F.2d 1118 (4th Cir. 1973), *cert. denied*, 419 U.S. 876, 95 S.Ct. 139, 42 L.Ed.2d 116 (1974), mistrials were in fact declared by the trial court. *Thompson v. United States*, 155 U.S. 271, 15 S.Ct. 73, 39 L.Ed. 146 (1894), merely followed standard mistrial analysis in holding, in its factual context, that the double jeopardy clause did not bar retrial following the declaration of a mistrial. The simple fact is that none of those cases purports to confine trial courts to the declaration of a mistrial in all such circumstances. *Lee v. United States*, —— U.S. ——, 97 S.Ct. 2141, 53 L.Ed.2d 80 (1977), is distinguishable on its facts.[7] *Cf. United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971).

It should not escape notice that none of the cases cited by the majority involves a conscious decision by a trial court to dismiss an indictment rather than declare a mistrial when confronted with "governmental overreaching or misconduct." Indeed, in *United States v. Sanabria*, 548 F.2d 1 (1st Cir. 1976), the court in a somewhat analogous situation carefully pointed out that:

> More significantly for this case, when the defendant moves for a mistrial as the result of developments in the prosecution

*which are not attributable to prosecutorial or judicial overreaching*, the motion is "ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error." [*Id.* at 7, *citing United States v. Jorn, supra*, 400 U.S. at 485, 91 S.Ct. 547; emphasis supplied.][8]

But more than this, the very approach taken by the majority on this point is illogical. The majority seems to conclude that a mistrial *should have been* declared, and then proceeds as though it *was* declared. No citations are given to support or sanction any such appellate rewriting of the trial record. Such a quantum leap necessitates, in my view, a stronger analysis than this "saying it's so makes it so" approach.

The majority attempts to strength its conclusion by the suggestion that appellee either waived, or came close to waiving, his Fifth Amendment rights by moving to dismiss the indictment. Such use of mistrial analysis in non-mistrial cases met with disfavor in *United States v. Jenkins*, 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975), where the Court, per Mr. Justice Rehnquist, rejected as untenable a similar position taken by a dissenting circuit judge[9] in a case involving the mid-trial dismissal of an indictment. Mr. Justice Rehnquist noted that:

> [The dissenting circuit judge] analogized respondent's case to mistrial cases in which the "public's interest in fair trials designed to end in just judgments" may be weighed. *Illinois v. Somerville*, 410 U.S. 458, 470, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). That interest, he felt, would not be served by permitting a clearly guilty defendant to go free because of an erroneous interpretation of the controlling law. . . . We disa-

---

**7.** In *Lee* the motion to dismiss the indictment was made before jeopardy attached, but the trial court delayed ruling on it until after jeopardy attached. The Supreme Court said that the motion was analogous to a defense-requested motion for a mistrial since, if it had been ruled upon before jeopardy attached, a retrial would not have been precluded.

**8.** This same proviso is contained in the case that the *Sanabria* court principally relied on. *See United States v. DiSilvio*, 520 F.2d 247, 249 (3d Cir. 1975), *cert. denied*, 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386 (1975).

**9.** *See United States v. Jenkins*, 490 F.2d 868, 880 (2d Cir. 1973) (Lumbard, J., dissenting).

gree with this analysis because we think it is of critical importance whether the proceedings in the trial court terminate in a mistrial as they did in the *Somerville* line of cases or in the defendant's favor, as they did here. [*United States v. Jenkins, supra,* 420 U.S. at 365 n.7, 95 S.Ct. at 1011; citation omitted.] When the defendant does not know of possible grounds to support his motion until, as here, the jury is already impanelled, waiver of Fifth Amendment double jeopardy rights should not be found in a motion to dismiss. *See Serfass v. United States,* 420 U.S. 377, 394, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975). *See also People v. Key No. 251, November 1975 Term,* 383 N.Y.S.2d 953, 956 (Sup.Ct. 1976).

I assume that had the case proceeded to trial and had a judgment of acquittal been entered at the close of the evidence, the majority would agree that whether we, as appellate judges, agreed with that judgment would be irrelevant since its propriety would be beyond our review as retrial would be precluded by the bar of former jeopardy. *See Fong Foo v. United States,* 369 U.S. 141, 82 S.Ct. 671, 7 L.Ed.2d 629 (1962). Thus, the narrow question which the majority did not see fit to address is whether the same result is mandated when, based on a finding of prosecutorial misconduct, an indictment is dismissed with prejudice in exercise of the supervisory power of the trial court. I would hold that it is.

It must be remembered that we are not dealing here with the dismissal of an indictment prior to the attachment of jeopardy. *Compare United States v. Mack,* D.C.App., 298 A.2d 509 (1972); *United States v. Cummings,* D.C.App., 301 A.2d 229 (1973); *United States v. Quinn,* 540 F.2d 357 (8th Cir. 1976). In fact, the majority concedes, as indeed it must, that jeopardy attached when the jury was impanelled. *United States v. Sanford,* 429 U.S. 14, 97 S.Ct. 20, 21, 50 L.Ed.2d 17 (1976); *Serfass v. United States,* 420 U.S. 377, 388, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975); *United States v. Jorn, supra,* 400 U.S. at 474–75, 91 S.Ct. 547.

The double jeopardy test to be applied when a trial is terminated in a defendant's favor after the attachment of jeopardy was laid down in *United States v. Jenkins, supra,* the Court saying:

Here there was a judgment discharging the defendant, although we cannot say with assurance whether it was, or was not, a resolution of the factual issues against the Government. But it is enough for purposes of the Double Jeopardy Clause, and therefore for the determination of appealability . . . that further proceedings of some sort, devoted to the resolution of factual issues going to the elements of the offense charged, would have been required upon reversal and remand. Even if the District Court were to receive no additional evidence, it would still be necessary for it to make supplemental findings. The trial, which could have resulted in a judgment of conviction, has long since terminated in respondent's favor. To subject him to any further such proceedings at this stage would violate the Double Jeopardy Clause . . . . [*Id.* 420 U.S. at 369–70, 95 S.Ct. at 1013.]

Appeals analogous in various respects to the facts in the case before us have recently been barred by the Double Jeopardy Clause in the light of *Jenkins. See, e. g., United States v. Martin Linen Supply Co.,* 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977). The case most strikingly analogous, however, is that of *United States v. Means,* 513 F.2d 1329 (8th Cir. 1975).[10]

---

**10.** Appealability in *Means* was governed by 18 U.S.C. § 3731 (1970), which provides in pertinent part:

In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

The relevant statute applicable in this case is D.C.Code 1973, § 23–104(c), which provides:

The United States or the District of Columbia may appeal an order dismissing an indictment or information or otherwise terminating a prosecution in favor of a defendant or defendants as to one or more counts thereof,

The *Means* case dealt with charges arising from the American Indian Movement occupation of Wounded Knee, South Dakota. The trial court in *Means* treated a defense motion for a judgment of acquittal as one for the dismissal of the indictment. The court then granted that motion and pointedly rejected the sua sponte mistrial alternative because of what it characterized as five instances of prosecutorial overreaching. [*Id.* at 1331.] While all evidence had been heard in *Means*, the dismissal of the indictment did not purport to find the defendant innocent of the charged offense, but instead was based completely on prosecutorial misconduct.

The government noted an appeal and appellee Means contended before the circuit court that double jeopardy barred a reversal and remand. After an analysis of cases supporting retrial after the declaration of a mistrial, the circuit court noted:

> Neither the facts nor the policies expressed in the aforementioned cases apply to the present case. Defendants were not convicted at trial, nor was a mistrial declared. The situation presented herein is a trial which terminated in defendants' favor after jeopardy had attached, before a finding of guilt by the trier of fact . . . . Further, the court specifically rejected the mistrial alternative. Although our precise question [has] not [been] answered by the Supreme Court . . . the policies expressed in [*Serfass v. United States, supra; United States v. Wilson*, 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975); and *United States v. Jenkins, supra*] require our conclusion that a government appeal in this case would violate the Double Jeopardy Clause of the Constitution. [*United States v. Means, supra* at 1333.]

The court concluded that, as in *Jenkins*, further findings of fact would have been required on remand and that, since the dismissal of the indictment ended the trial in defendant's favor after jeopardy had attached, this would be impermissible under the Fifth Amendment [*id.* 513 F.2d at 1334]. All of these facts are present in the case at bar.

The court in *Means* also forcefully rejected the "mistrial by application of law" theory that the majority would have this court adopt. Said the court in *Means*:

> The Government attempts to avoid the applicability of the Double Jeopardy Clause and [recent Supreme Court cases] by arguing that before the judgment of dismissal was entered a mistrial had occurred by operation of law. This "mistrial by operation of law" theory is implicitly bottomed on the belief that the District Court could do nothing but declare a mistrial. . . . The Government's belief, however, is unsupported by the District Court's action, as well as by law. [*Id.* at 1334.]

The circuit court goes on to note that the trial court specifically rejected the mistrial alternative in deciding that prosecutorial misconduct necessitated a dismissal of the indictment. The court concluded that "even if we could conceive of a situation in which a mistrial would arise by operation of law, we are convinced that this is not the case [here]." [*Id.* at 1335.]

The majority seems to suggest that a mistrial occurred by operation of law when the jury was discharged by the trial court. Neither *United States v. Sedgwick*, D.C. App., 345 A.2d 465 (1975), *cert. denied*, 425 U.S. 966, 96 S.Ct. 1751, 48 L.Ed.2d 210 (1976), which involved the discharge of a jury after the declaration of a mistrial by the trial court, nor *United States v. Sanabria*, 548 F.2d 1 (1st Cir. 1976), which did not involve an allegation of prosecutorial overreaching, support the conclusion that a mistrial occurs by operation of law when the trial court discharges a jury but specifically reserves for later decision whether a mis-

---

except where there is an acquittal on the merits.

Of course, the double jeopardy warning that is explicit in the federal statute must be deemed to be inherent in our local statute to avoid a finding that that statute is unconstitutional. *See, e. g., People v. Brown*, 40 N.Y.2d 381, 386 N.Y.S.2d 848, 353 N.E.2d 811 (1976), *cert. denied*, 429 U.S. 975, 97 S.Ct. 482, 50 L.Ed.2d 583 (1977).

trial or a dismissal of an indictment will be the final outcome in the case. As the trial court repeatedly pointed out, discharge of the jury is as consistent with the dismissal of an indictment as it is with the declaration of a mistrial since neither remedy contemplates further use of the jury then impanelled.[11]

The majority concludes that the action taken by the trial court was wrong, but this alone will not support a substitution of our viewpoint on appeal. In *Means,* the circuit court made it clear that:

> Whether or not [the trial court's] dismissal of the indictments was correct is not the question before this court, and we intimate no opinion as to whether the instances of government misconduct specified by [the trial court] are supported by the record or were severe enough to warrant dismissal. Instead, our question is whether the dismissal is appealable. Since the dismissal terminated the trial in defendant's favor, after jeopardy had attached, and there is no way that a retrial could be avoided in the event of reversal and remand, we hold that the Government's appeal is barred by the Double Jeopardy Clause and must be dismissed.
> . . . [*United States v. Means, supra* at 1335; footnote omitted.]

The court went on to say that since the trial court determined that government misconduct warranted dismissal of the indictments under the supervisory power of the court "[t]his conclusion, coming after jeopardy had attached and before verdict, is effectively unreviewable." [*Id.*]. The court concluded:

> [Although the] Government feels particularly aggrieved at the charges of prosecutorial misconduct, . . . these charges and the court's findings thereon must be left unreached and unresolved on this appeal. [*Id.* at 1336.]

In my opinion, *Means* is squarely on point and I would follow its holding in the instant case.

For the above reasons, I respectfully dissent.